# *Ex parte John Hardy.*

### *Application for Writ of Habeas Corpus.*

1. *Contempts; every court exclusive judge of.*—Every court is the exclusive judge of a contempt committed in its presence, or against its process; and the exercise by a court of competent jurisdiction of the power to punish for such contempt, can not be revised on error, or assailed collaterally by writ of *habeas corpus*.

2. *Habeas corpus; when appropriate remedy for the release of a prisoner.*—The writ of *habeas corpus* is the appropriate and legal remedy for the release of a prisoner who is restrained of his liberty under process issued by a court, where there is either a total want, or an excess of jurisdiction in the court, under the order or judgment of which the process issued.

3. *Constitutions; how construed.*—Constitutions are to be construed in the light both of the common law and of previously existing constitutions; and all provisions designed for the protection of life, liberty and property are to be liberally construed in favor of the citizen.

4. *Same; legislative interpretations* —The uniform legislative interpretation of doubtful constitutional provisions, running through many years, is of weighty consideration with the courts, as is also the contemporaneous exposition of the Bar.

5. *Section 21 of Art. I of the constitution construed.*—Section 21 of Art. 1 of the constitution of 1875, which provides that "no person shall be imprisoned for *debt*," is not to be construed to prohibit the General Assembly from enacting laws authorizing imprisonment for liabilities originating in *tort*, or *ex delicto*. It has reference only to obligations *ex contractu*.

6. *Same.*—That section must be construed to abolish the whole system of imprisonment for debt, which prevailed in this State from 1819 to 1868, when it was first adopted in its present form; and no exception can be made in cases of fraud.

[Ex parte John Hardy.]

7. *Section 3887-9 of the Code of 1876 construed.*—The act of March 8, 1871, now composing sections 3887-9 of the Code of 1876, confers a new and extensive jurisdiction upon courts of chancery, not previously possessed, and its manifest purpose is to coerce the payment of an ordinary judgment debt by imprisonment in the county jail, under the guise of making a refusal to pay a contempt of court.

8. *Statutes; when unconstitutional.*—As the General Assembly can not do indirectly what it is prohibited from doing directly, any law which seeks by evasion or indirection to accomplish an unconstitutional end, is null and void.

9. *Section 3889 of the Code of 1876 unconstitutional.*—Section 3889 of the Code of 1876 is, in its true essence and purposes, a law authorizing imprisonment for debt ; and it is therefore unconstitutional and void.

BRICKELL, C. J., *dissenting, held:*

1. *Jurisdiction of this court to issue writs of habeas corpus.*—This court has no original power to award a writ of *habeas corpus ;* it can issue such writ only when necessary in the exercise of the "general superintendence and control of inferior jurisdictions," with which it is clothed by the constitution.

2. *Same.*—On application for such writ, this court exercises appellate jurisdiction only, and is confined to an inquiry into the correctness of the decision of the lower court or magistrate on the facts presented for its decision ; and deficiencies in the case, as there presented, can not be here supplied.

3. *City Court of Selma; its powers and jurisdiction.*—The City Court of Selma is invested by the statute creating it with "the powers and jurisdiction which are now, or may hereafter be conferred by law on the several circuit and chancery courts ;" and its judgments and decrees, when reviewed or examined by this court, stand on the same footing with the judgments and decrees of those courts.

4. *Courts of equity; their jurisdiction under the constitution of this State.*—The constitution ordains and establishes courts of equity, but does not define their jurisdiction ; hence, their jurisdiction, so far as is consistent with our institutions and form of government, embraces the same subjects, and is co-extensive with that of the English Court of Chancery ; and it is exercised in the same modes of procedure, and is governed by the same practice, except as changed or modified by statute, or by rules prescribed by this court.

5. *Same; process for execution of decrees.*—Originally, in the absence of statutes providing otherwise, and giving other remedies, decrees of courts of equity, of whatever kind or nature, operated strictly and exclusively *in personam ;* and the only remedy for their enforcement was by what was and is termed process of contempt, under which the party failing to obey them was arrested and imprisoned, until he yielded obedience, or purged the contempt by showing that disobedience was not wilful, but the result of inability, not produced by his own fault or contumacy. And our statutes, authorizing the use of common law writs by courts of equity for the collection of money, or for obtaining possession of land, or personal property, do not exclude or supersede the ordinary equitable remedies, but merely give to these courts cumulative remedies.

6. *Attachment for contempt; when a civil remedy.*—The process of attachment is termed process of contempt, and, in theory, it is founded on the offence given the court by the failure to obey its rules, orders or decrees ; and when employed by a court of equity to enforce its rules, orders or decrees, for the benefit or protection of its suitors, it is but a civil process, in the nature of an execution, for the benefit of the party injured, or in interest.

[Ex parte John Hardy.]

7. *Jurisdiction; when error in determining its existence does not render judgment void.*—It is a well settled principle, that when a court has jurisdiction under particular circumstances, or has jurisdiction of a particular class of cases, error in adjudging the existence of the circumstances, or in adjudging that a particular case is of the class to which its jurisdiction extends, does not render the judgment void and assailable collaterally ; and this principle is as applicable to the procedure on *habeas corpus*, as to any other judicial proceeding.

8. *On collateral attack of a decree of a court of equity, when jurisdiction presumed.*—If a court of equity has jurisdiction, under any state of facts, to render a decree against a defendant in a cause pending therein, for the delivery by him of money, property or effects, adjudged to be in his possession and under his control, to the register, and to enforce obedience to that decree by process of attachment for contempt; such state of facts must be presumed on *habeas corpus* for the discharged of the defendant who had been committed under such process, where it is not negatived by the process, or controverted on the hearing.

9. *Habeas corpus by defendant committed for contempt by a court of equity; scope of inquiry.*—On the hearing of a writ of *habeas corpus* before a chancellor, the sheriff's return vouching, as the cause of the petitioner's imprisonment, a writ of attachment issued by the City Court of Selma, having and exercising the jurisdiction of a court of equity, in which was set out the order of commitment for contempt, as therein charged and specified, and the return not being controverted, the chancellor had no authority to inquire into the legality or propriety of the order of commitment, unless it is void for want of jurisdiction ; and this court, in reviewing his decision,can not look beyond the sheriff's return.

10. *Commitment for contempt; habeas corpus not the appropriate remedy for discharge from.*—The writ of *habeas corpus* is not an appropriate remedy to inquire into the sufficiency of a commitment for contempt by a court of competent jurisdiction; and on the hearing under the writ, no inquiry will be made into the causes of contempt which are assigned in the commitment.

11. *Jurisdiction to reach and subject a debtor's property; antiquity of.*— In England, at least since the time of Lord Hardwicke, the jurisdiction of the chancery court to reach and subject a debtor's property at the instance of creditors who have exhausted their legal remedies, has been recognized, though there has been some conflict of opinion as to the character of the property which may thus be reached.

12. *Sections 3887-9 of the Code construed.*—The statute which authorizes a judgment creditor, his assignee or personal representative, who has exhausted his legal remedies, to file a bill in equity against his debtor to compel a discovery of money, property or effects liable to the payment of his debt ; and empowers the court, after a judicial ascertainment of the existence of such money, property or effects, to render a decree requiring the debtor, within a specified time, to deliver the same to the register, and to make all necessary orders for the collection and recovery thereof, and to imprison the defendant until he complies with the decree (Code, §§ 3887-9), is merely a regulation of a pre-existing, original jurisdiction of the court, and intended to render it more effective.

13. *Same; constitutional exemptions not affected thereby.*—This statute does not take away or impair the debtor's right of exemptions, as secured by constitutional and statutory provisions, as it only applies to money, property, or effects liable to the payment of the debt; and this fact must be judicially ascertained by the court.

14. *Same; the statute does not deprive the debtor of the right of trial by jury.*—Nor does this statute deprive the debtor of the right of trial by jury, further than it is denied in all cases in equity.

(20)

[Ex parte John Hardy.]

15. *Same; nor deprive him of right of bail.*—Nor does it deprive the debtor of any right of bail, as known to the common law, or as given by any statute.

16. *Same; nor authorize imprisonment for debt.*—Nor does it authorize imprisonment for debt, within the meaning of the constitutional provision inhibiting such imprisonment. The imprisonment contemplated by the statute is not for debt, but for the neglect and refusal to perform a moral and legal duty, which the debtor has the ability to perform, and which he has, by the decree of the court, been ordered to perform.

17. *Imprisonment for debt; constitutional provision construed.*—The constitutional provision prohibiting imprisonment for debt has no reference to, or operation upon the remedies and process of courts of equity, which are intended to reach the property a debtor is ascertained to have, liable to the payment of his debts, which he fails and refuses to deliver up, on the order of the court, for the benefit of his creditors.

APPLICATION to this court for a writ of *habeas corpus*, the same having been denied by Hon. N. S. GRAHAM.

The petition in this cause was filed in this court on the 2d June, 1881, and it shows, that, at the time of its filing, the petitioner, John Hardy, was imprisoned and restrained of his liberty in the jail of Dallas county by the sheriff of that county, under and by virtue of an attachment, which was issued out of the City Court of Selma on the 4th May, 1881, a copy of which is made an exhibit to the petition. This attachment, as averred in the petition, was issued under the following circumstances, to-wit: On 1st November, 1876, W. A. Ransom & Co. and others, judgment creditors of a late firm composed of John Hardy and Jesse B. Hardy, and trading under the firm name of John Hardy & Co., on their own behalf, and on behalf of all other creditors of that firm, who might come in and make themselves parties &c., filed their bill of complaint on the equity side of the City Court of Selma against John and Jesse B. Hardy, alleging the recovery by them of their respective judgments, and that executions had been duly issued thereon and returned "no property found"; and that "the said John Hardy and Jesse B. Hardy have property, money or effects, which are or ought to be made liable for the payment of said debts and judgments aforesaid; but the kind and description and location of said property, money or effects are to orators unknown." The prayer of the bill was for a discovery of such property, money or effects, and that "said defendants may be required by the decree of this Honorable Court to pay over and deliver to the clerk and register thereof, within a time to be fixed by your Honor, any such money, property, or other valuable thing, as this court may determine may or ought to be delivered for the payment of said judgments."

[Ex parte John Hardy.]

The petition further shows, that on the 1st June, 1878, on the hearing of the cause made by said bill, had on pleadings and proof, the City Court of Selma rendered a decree, ascertaining the amounts due respectively to the complainants, and again rendering judgments in their favor against the defendants therefor, and further ascertaining and declaring that John Hardy " had in his possession, or subject to his control fifty-one bonds of the United States of America, known as five-twenty bonds, of one thousand dollars each, amounting to fifty-one thousand dollars." This decree ordered, that, if John Hardy failed to pay said judgments, he should deliver said bonds, or so many of them as were sufficient to pay and discharge said judgments, by the 3d August, 1878, and that a copy of the decree be served forthwith upon him. The petition further shows, that on the 1st November, 1878, John Hardy having failed to pay said judgments, and also failed to deliver said bonds, on motion of the complainants, an order was entered directing an attachment to issue against him, directed to the sheriff, and commanding him to arrest Hardy, and imprison him in the jail of Dallas county, until he should obey said decree, or until the further orders of the court. Under this order an attachment was issued, as directed, but was not executed; and on the 4th May, 1881, on an order made and entered by said court, an *alias* attachment was issued, and under this attachment Hardy was arrested and committed to jail. It is charged in the petition, that the order directing the attachment to issue was in excess of the jurisdiction of said court, and was therefore void.

The petition further avers, that on the 10th May, 1881, the relator caused to be presented to the Hon. N. S. Graham, Chancellor of the Eastern Chancery Division, a petition for a writ of *habeas corpus*, which is set out in the petition to this court. Its averments are, " that John Hardy is imprisoned by W. J. Rountree, as sheriff of the county of Dallas, and State of Alabama, in the jail of said county, in the city of Selma, under an attachment issued out of the equity side of the City Court of Selma," a copy of which is made an exhibit thereto. The petition further avers, that the writ having been issued as prayed, the sheriff made the following return thereto : " I hereby return that I hold said John Hardy in the jail of Dallas county by virtue of an attachment for contempt, issued out of the City Court of Selma, of which ' Exhibit A ' attached to the petition for the writ of *habeas corpus* is a true and correct copy." Omitting the title of the cause, the attachment is in these words :

"To the Sheriff of Dallas County—Greeting :

*Whereas*, on the 1st day of November, 1878, an order was

[Ex parte John Hardy.]

made in the above stated cause by the judge of the City
Court of Selma, in the words and figures following, to-wit:
(After stating the title of the cause,) ' The complainants file
and present their petition in this cause, praying that the de-
fendant, John Hardy, be attached and imprisoned for his
refusal to comply, and until he does comply, with an order of
the court made and entered in this cause at its last term, re-
quiring him, the said Hardy, to deliver to the clerk and reg-
ister of the court certain United States bonds, by the 3d day
of August, 1878.   And the clerk and register of this court
makes his report in writing to me, as judge of the said court,
making known the fact, that said Hardy had failed to com-
ply with the order of said court as to the delivering of said
bonds to him ; and from said petition and the affidavits of
complainants' solicitor, and of defendant, John Hardy, ac-
companying the same, and from the said report of the clerk
and register, and the original affidavits of said defendant, and
of complainants' solicitor accompanying the same, and from
the file of original papers, and the decree in this cause, which
are submitted with said petition, it appears to me, as such
judge, that at the last term of the court a decree was ren-
dered against said John Hardy and Jesse B. Hardy, in
which, among other things, it was ordered by the court, that
the defendant, John Hardy, if he shall fail to pay said judg-
ments to complainants respectively, as above rendered
against him, deliver to the clerk and register of this court,
by the 3d day of August, 1878, fifty-one bonds, known as
five-twenty bonds of the United States of America, of one
thousand dollars each, or so many of them as are sufficient
to discharge the several judgments to complainants, as afore-
said, interests and costs, and the costs of this suit against
him ; that said John Hardy had notice of said decree by ser-
vice of a copy thereof on him by the sheriff of Dallas county,
on the 11th day of June, 1878 ; that said judgments remain
wholly unpaid, that said John Hardy has wholly failed and
refused to comply with the order of said court in respect to
the delivery of said bonds to said clerk and register, and that
on the 1st day of August, 1878, he made and filed with said
clerk and register his affidavit in writing, in which he at-
tempts to show cause, why he has not complied, and can not
comply with the said order of said court ; and it further ap-
pearing to me, that, by reason of the matters aforesaid, the
said John Hardy is guilty of a contempt of said court and its
orders, and that there exists no reason why a rule *nisi* should
issue to him requiring him to show cause why he shall not be
attached for a contempt of said court ; it is ordered that the
clerk and register of said court issue an attachment against

[Ex parte John Hardy.]

the person of said John Hardy, directed to the sheriff of Dallas [county], commanding him to arrest said Hardy and imprison him in the jail of Dallas county, until he shall obey said decree in respect to the delivery of said bonds, or until the further order of said City Court of Selma, or of the presiding judge thereof. In vacation, November 1st, 1878. Jon. Haralson, Judge of the City Court of Selma.'

*And whereas,* at the January term, 1881, of the City Court of Selma, an order was made and entered in the words and figures as follows, to-wit: (After stating the cause,) 'Came the complainants by their solicitor, and, on motion, it is ordered, that an *alias* writ of attachment against John Hardy, one of the defendants, be issued': You are, therefore, hereby commanded, as heretofore, that you arrest said John Hardy and imprison him in the jail of Dallas county, until he shall obey said decree in respect to the delivery of said bonds, or until the further order of said City Court of Selma, or of the presiding judge thereof in the premises.

Witness my hand, at office in Selma, this, the 4th day of May, 1881.                          J. L. Evans,
    Clerk and Register of the City Court of Selma."

The petition further avers, "that on the 26th May, 1881, the said cause was heard before his Honor, the said N. S. Graham, and the facts above set forth were proven before him"; and that he made an order overruling "the motion of petitioner to be discharged from the imprisonment referred to in this petition."

It does not appear from the record that any bill of exceptions was taken on the hearing before the chancellor, or that he certified any of the facts proved before him.

White & White, and B. F. Saffold, for petitioner. (No brief came to the hands of the reporter.)

William R. Nelson, *contra.*—1. This cause has been presented and argued in this court as if the *constitutionality* of the act of March 8, 1871 (Code of 1876, §§ 3888–9) was *the only question involved;* and as if the *jurisdiction* of the City Court of Selma in the cause, in which the decree under which the petitioner was imprisoned, rested *alone* upon that act. But we insist, that this court can not consider that question in this proceeding, because *habeas corpus* is not petitioner's remedy. The City Court of Selma is a court of general jurisdiction, clothed with the same powers, and having the same jurisdiction as a court of chancery. The petition shows that it had jurisdiction over the *subject-matter* and over the *person* of the petitioner. His

[Ex parte John Hardy.]

remedy was by appeal from that court's decree; but this right he failed to exercise. That decree can not be reviewed by *habeas corpus*. *Ex parte* Cleveland, 36 Ala. 306. And, again, it is not shown, except by the averments of the petition, what were the *facts* in the case *before the City Court of Selma*, when the decree was rendered, or what were *the facts which were brought to the attention of the chancellor*, when he refused the petition. No bill of exceptions was taken, nor are the facts which were in evidence before the chancellor otherwise brought before this court. How, then, can this court say that the City Court acted without jurisdiction, or that its decree was in excess of its jurisdiction? Or that the proceedings in that court were based on the act, which is attacked as unconstitutional? If the decree of that court can be upheld on any ground, then it should be sustained, and not adjudged to be void.—*McDougald v. Dougherty*, 39 Ala. 435.

There are cases where this court has reviewed the judgments of lower courts on writs of *habeas corpus*; but they were *criminal* cases, where the punishment was limited by statute, and the court had exceeded its *authority* and *power* as defined by the statute. In such cases the judgments were held to be *void.*—*Ex parte Simmons*, 62 Ala. 416; *Ex parte Brown.* 63 Ala. 188. But this decree and the commitment thereunder for contempt can not be held to be *void*.

*Prohibition* will not be granted, unless the lower court has *usurped* jurisdiction, or has abused its power; and not then, if there is another remedy.—High on Ex. Leg. Rem. 767; *Ex parte Lyon*, 60 Ala. 650; *Ex parte Branch & Co.*, 63 Ala. 383; *State, ex rel. Brooks*, 51 Ala. 61.

2. "The court whose authority has been contemned is the *sole judge* of the extent and culpability of the *contempt* and of the answer to purge it."—*State v. Thurmond*, 37 Texas, 340; *People v. Orser*, 12 How. (N. Y.) 550; *Re Stokes*, 5 S. C. 71; *People v. Spalding*, 10 Paige, 284; 7 Hill, 301; *Re Perry*, 30 Wis. 268; 42 N. H. 540 and cases cited. As to what is contempt, see 2 Casey, 9 (*Williamson's case*); 4 Bl. Com. 129; *Durant v. Supervisors Washington Co.* 1 Woolworth C. C. Rep. p. 381.

3. But the constitutionality of the act of March 8, 1871, is not necessarily involved in this case, because *that act made no material changes in the law, or in the power of courts of equity in matters of discovery.* We had a *statute almost identical* with this one, as far back as 1844. See *Bates v. Brown*, 10 Ala. 432. And independent of any statute on the subject, courts of equity had full power, jurisdiction and authority in cases like the one in which the decree of the City Court was ren-

[Ex parte John Hardy.]

dered.—1 Mad. Ch. 109; *Ib.* 206 ; *McDermutt v. Strong,* 4 Johns. Ch. 690 ; *LeRoy v. Rogers,* 3 Paige, 234 ; *Hadden v. Spader,* 20 Johns. 570 ; *Bay State Iron Co. v. Goodall,* 39 N. H. 223; 44 N. H. 551 ; 8 N. H. 425 ; 11 N. H. 311 ; 11 Ohio, 273 ; *Ib.* 292. The chancery court having jurisdiction, could and should retain the case to administer the relief *consequent upon the discovery sought.* 17 Ala. 59 ; 15 Ala. 99 ; 12 Ga. 267 ; 1 Mad. Ch. 216; 6 Gratton, 427 ; 3 Ala. 96-7 ; 25 Ala. 108 ; 48 Ala. 456; 8 Ala. 784.

4. The bill in the case in which the decree was rendered was a creditor's bill. Creditor's bills and bills for discovery and relief have long been the subject of chancery jurisdiction in this State.—*Reese v. Bradford,* 13 Ala. 845 ; 1 Brick. Dig. p. 655, § 219 ; *Mixon v. Dunklin,* 48 Ala. 456. In the case last cited one of the learned counsel for petitioner (then on the bench) said : " When an execution has been issued and is not satisfied, and he wishes to compel the discovery of *any* property belonging to the debtor." the complainant could use Section 3882, Rev. Code, (§ 3442 of Code of 1876, which gives the plaintiff in execution the right to a bill for discovery upon return of his execution "no property found." Is this section to be swept away, together with sections 3901, 3902, 3904 and 3776 of the Code of 1876, by the proposition contended for by counsel for petitioner? Without them, chancery courts will have no power to enforce the execution of their decrees.

5. It is contended, that the statute denies petitioner the right of trial by jury. Even in law courts, if no jury is demanded, the right is *waived.*—1 Stew. 63 ; 4 S. & P. 263 ; 15 Ala. 81. And the statutes regulate jury trials in chancery cases. 35 Ala. 229, and cases cited.

6 a. The statute does not provide imprisonment *for debt.* The non-imprisonment clause of the constitutions prior to that of 1875, was : " The person of a debtor, when there is no strong presumption of fraud, shall not be detained in prison after delivering up his estate for the benefit of his creditors, in such manner as shall be prescribed by law." The words, " where there is no strong presumption of fraud," mean cases where fraud can not be imputed to the debtor. This provision was intended to protect innocent people— those who were not guilty of fraud—*after they delivered up their estates.* As to all others, or as to those who *had acted fraudulently,* there was provided no immunity from imprisonment for debt, *even after* they had surrendered their estates. So that, under the old constitution, a fraudulent debtor—one who had been detected in an effort to hinder, delay and defraud his creditor, by absconding or otherwise—could be

[*Ex parte John Hardy.*]

imprisoned, even when the very property he was attempting to conceal or make way with, was surrendered. In this constitutional provision, there was an evil couched somewhere. That evil was some hardship, or wrong.—Cooley's Con. Lim. 65. What was it? It surely was never a hardship or wrong for a debtor to give up his property to his creditor. Good faith in paying just obligations is one of the best evidences of the honesty and virtue of a community. This every good government must be supposed to be desirous of promoting.

The great evil of that provision was, that under it a debtor who may have acted fraudulently, might be imprisoned, even when he had delivered up the *whole of his estate*. Such poor, unfortunate and tempted debtor had no protection against the rapacity of his creditor. This protection it was the intention of the framers of the constitution of 1875, to give. This was the evil, and the remedy provided was: " There shall be no imprisonment for debt in this State."

*b*. Authorities examined. No case *in point* is cited by the numerous counsel for petitioner, to show that the statute is violative of this provision of the constitution. In *Ex parte Grace*, 12 Iowa, 208, relied on by them, the report of the case shows, that it was a proceeding in a LAW COURT before a county judge for " an examination," and it was found, that the defendant had *money* in his possession, which he refused to give up. Upon his refusal, he was imprisoned, as for a contempt, until he should comply with the order. This case is not an *authority* to show that a court of chancery has not the power exercised by the City Court of Selma.

Reference is also made to 57 Ga. 407; but that is a case of *tort*, and is not in point. In a later case in that State an attorney withheld money, which belonged to his client, and upon proceedings in a law court against him to require him to pay over the money, he contended that the effort to force him to pay it over by imprisonment, as for a contempt, was simply "imprisonment for debt," and violative of a provision to the constitution of that State substantially, if not identically, like the provision under consideration. But the Supreme Court of that State found numerous good and sound reasons to hold him.—*Smith v. McClendon*, 59 Ga. 523.

It has also been held, that a fine of $3000.00 imposed for a contempt in violating an injunction was not affected by the discharge of the defendant under the *bankrupt law.—People v. Spalding*, 10 Paige, 287; affirmed in 7 Hill, 302. And again, that a party attached for non-payment of costs was entitled to jail liberties, but was not exempt from imprisonment under an act, abolishing imprisonment for debt.—*Patrick v. Warner*, 4 Paige, 397.

[Ex parte John Hardy.]

A limitation as to punishments for contempt committed in presence of court has been held to have no application to contempts for failure to obey a decree.—38 Conn. 123.

A commitment of a defendant for refusal to pay *alimony* has been held not to be *imprisonment for debt.*—*Wightman v. Wightman*, 45 Ill. p. 167. See also *Petrie v. People*, 40 Ill. 334; *Yates v. Lansing*, 9 Johns. 395; 5 Cal. 494.

Punishment by imprisonment for a contempt in refusing to obey the mandate of a court of equity, was not the *mischief* the people desired to remedy in inhibiting imprisonment for debt.—5 Md. 471 ; Story on Con. §428.

7. The decree requiring the petitioner to deliver the bonds to the register, was, in effect, *the appointment of a receiver to take charge of them.* This is an important view of this case. Nothing is more common in practice in this State, than for chancery courts to appoint the register to take charge of property in a pending cause.—High on Rec. §71. In the cause in the City Court the register was clothed with the power of a receiver, to whom the petitioner, a defendant in the cause, was required to deliver property subject to an equitable lien. If such an order can be defied, why can not a *receiver in any cause* be defied?

8. If there is a doubt as to the unconstitutionality of the act in question, the act should not be declared unconstitutional. "A reasonable doubt must be solved in favor of the legislative action, and the act be sustained."—Cooley's Con. Lim. p. 182, and cases cited ; *Sadler v. Langham*, 34 Ala. 311.

SOMERVILLE, J.—The relator, John Hardy, was sentenced to imprisonment in the jail of Dallas County, on May 10th, 1881, for an adjudged contempt of court, under the following state of facts: Under the provisions of sections 3887-3889 of the Code of 1876, a bill had been filed by Ransom & Co. against Hardy and others, on the equity side of the City Court of Selma, praying for a discovery of property, money or effects in the hands of said defendants, which were alleged to be liable to the satisfaction of complainants' judgments, upon which there had been a return of "no property found" by the sheriff. On the trial of the cause, the court found that the defendant John Hardy, who is here the petitioner, had in his possession sundry United States bonds, more than sufficient to satisfy the debts claimed of him, and ordered him to deliver to the register, within a time fixed by the decree, these bonds, or so many of them as might be necessary to pay these judgments and costs of suit. This the defendant refused to do, alleging an excuse deemed by the court untrue, and therefore insufficient. And for such refusal

[Ex parte John Hardy.]

he was adjudged guilty of a *contempt*, and sentenced to *imprisonment* until he should obey this mandate of the court. A petition for the writ of *habeas corpus* was presented to the Hon. N. S. Graham, Chancellor of the Eastern Chancery Division of the State, the prayer of which was, on final hearing, refused by him, and thereupon the application is renewed before this court.

Sections 3887-3889 of the Code, under which these proceedings were had, provide as follows :

§ 3887. "In every case where execution may have been, or hereafter shall be, issued from any court of record in this State, upon which there is a return of "no property" by the proper officer, the plaintiff in such execution, his assignees, executors, or administrators, may file a bill in the chancery court of the chancery district in which such defendant may reside, or in the county in which the judgment or decree was rendered, alleging that execution has been issued and returned as aforesaid, and that *the defendant has property, money, or effects, which are liable to the payment of the debt*, and requiring the defendant to answer, under oath, what property he has, the nature thereof, in whose hands it is, and where situated ;-and any number of parties may join as complainants in such bill."

§ 3888. "Whenever it shall appear to the court, from the answer of the defendant, or from other evidence, that the defendant has money, property or effects, as aforesaid, either in or out of the State, it shall have power to render a decree, requiring the defendant to *pay or deliver* to the register of the chancery court, within a time to be fixed by said decree, *such money, effects* or *property*, as the court may determine ought to be paid or delivered, *for the payment of such execution;* and the court in term time, or the chancellor in vacation, may make all necessary orders for the *collection and recovery* of such effects or money."

§ 3889. "If any such defendant shall fail to comply with the terms of such decree, he *shall be guilty of a contempt;* and the court, or the chancellor in vacation shall, upon the report of the register to that effect, have the power to *imprison* the defendant in the county jail *until he shall obey the decree;* and all transfers or assignments of any property by the defendant, after the filing of such bill aginst him, shall be void."

It is insisted by the petitioner's counsel that these sections of the Code, which embrace the provisions of an act of the legislature, entitled "An Act to extend the jurisdiction of courts of chancery," approved March 8, 1871 (Session Acts 1870-71, p. 34), are unconstitutional and void, as being violative of Sec. 21, Art. 1 of the constitution of the State, at least

[Ex parte John Hardy.]

so far as they authorize the imprisonment of a defendant. This section of the Declaration of Rights declares that "no person shall be *imprisoned for* DEBT."

The only question arising for our determination is, whether the sentence to imprisonment for the alleged contempt in this case is, in its essential nature and purposes, an "imprisonment for debt." If so, the law authorizing it is void, otherwise not.

It can not be denied, that every court is the exclusive judge of a contempt committed in its presence or against its process, and that the exercise of such power by a court of competent jurisdiction can not be revised on error, nor assailed collaterally by resort to a writ of *habeas corpus*. *In Re Cooper*, 32 Vt. 253 ; *People v. Sturtevant*, 9 N. Y. (5 Seld.) 263 ; *Ex parte Adams*, 25 Miss. 883 ; *Ex parte Henry Sam*, 51 Ala. 34.

But where there is either a want, or excess of jurisdiction in the committing court, a writ of *habeas corpus* is then the appropriate remedy for the release of the prisoner.—*State v. Towle*, 42 N. H. 540 ; *Ex parte Brown*, 63 Ala. 187 ; *Ex parte Simmons*, 62 Ala. 416 ; *Ex parte Grace*, 12 Iowa, 208. The present application is, therefore, the proper method of testing the constitutionality of the statutes in question, and of thus assailing the jurisdiction of the primary court by virtue of whose order the prisoner is restrained of his liberty.— Code, § 4936 ; *In matter of Blair*, 4 Wis. 521.

The ordinary power of courts to punish contempts, as a means of enforcing obedience to their lawful orders and decrees, is in no wise challenged or denied, but is fully recognized in argument by the petitioner's counsel, as being imperatively necessary to the administration of justice. No doubt can be entertained of their authority to enforce such decrees by process of attachment, without which they would be bereft of all possible power to maintain the majesty of the law as against refractory litigants, and even impotent to preserve their own existence.—*Ex parte Walker*, 25 Ala. 108 ; *Gates v. McDaniel*, 3 Port. 358 ; *Randall v. Pryor*, 4 Ohio, 424. It is often said that contempts of court are in the nature of a "special criminal offence," and the proceedings for their punishment are in the nature of a criminal procedure.—*In Re Williamson*, 26 Pa. St. 9. However this may be, punishments for contempt have a double aspect : *First*, To vindicate the dignity of the court from disrespect exhibited to it, or its orders. *Secondly*, To compel the performance of some order or decree of the court, which it is in the power of the party to perform, and which he, without sufficient excuse, refuses to obey.—*In Re Chiles*, 22 Wall. 158.

[Ex parte John Hardy.]

It is urged that a debtor can not be coerced, by the use of this process, into paying an ordinary debt, through the guise of a law which seeks to pronounce the refusal to do so a contempt; and that such a procedure is really and logically but another form of "imprisonment for debt." The solution of this question requires us to construe the meaning and effect of the present constitutional provision, found in the bill of rights, that "no person shall be imprisoned for debt."—Const. 1875, Art. 1, § 21.

The same guaranty occurred for the first time, in its present form, in the constitution of 1868, being there embodied in identical phraseology.—Const. 1868, Art. 1, § 22 (Decl. Rights). The history of this guaranty against imprisonment for debt in the various constitutions, heretofore adopted in Alabama, and the change in its language, become important in our efforts to ascertain its proper meaning, for it is a sound rule of construction, that such charters of liberty are always to be interpreted, not only in the light of the common law, but also by comparison with previously existing constitutions. —*Mayor &c. v. Stonewall Ins. Co.* 53 Ala. 570. Said BRICK-ELL, C. J. in the latter case: "New provisions, having their origin in larger experience, introduced into an amended or revised constitution, are to be construed, and allowed such operation as will secure the purposes for which they were introduced; and these purposes are to be ascertained from a just consideration of the causes in which they originate."

In the constitution of 1819, Section 18, Art. 1, which is the clause relating to the imprisonment of debtors, reads as follows: "The person of a debtor, where there is not strong presumption of *fraud*, shall not be detained in prison, *after delivering up his estate* for the benefit of his creditors, in such manner as shall be prescribed by law." The same language precisely occurred in the constitution of 1861 (Art. 1, § 18), and again in that of 1865 (Art. 1, § 22), and thus constituted a part of the fundamental law of Alabama uninterruptedly for nearly half a century.

We may premise the consideration of this important question, by saying that it has been, as we think properly, decided, that similar provisions in the several State constitutions against imprisonment for DEBT apply only to actions based on *contracts*, express or implied, and that they do not extend to actions originating in *tort*.—*People v. Cotton*, 14 Ill. 414; *Cotton v. Sharpstein*, 14 Wis. 226. Hence it has been held, that a statute allowing an arrest in a civil action for *libel* does not violate a section in the constitution of North Carolina, which provides that "there shall be no imprisonment for debt except in cases of fraud."—*Moore v. Green*, 73 N. C. 394.

[Ex parte John Hardy.]

And again, in like manner, that the constitution of the State of Georgia, which simply prohibited "imprisonment for debt," was not violated by imprisonment under bail process in an action of *trover*.  *Harris v. Bridges*, 57 Ga. 407.  It is not to be supposed, that the framers of the constitution intended to prohibit the legislature from authorizing the remedy of incarceration as a means to coerce the payment of damages originating *ex delicto*, but only of a debt originating *ex contractu*. Where the property of another than the debtor has been taken by fraud or violence, or is withheld so as to tortiously deprive the true owner of his rights, the act is *quasi* criminal, and the prohibition as to imprisonment has no application.— *Caldwell v. The State*, 55 Ala. 133.

The sole object of all rules and maxims of interpretation is, to discover the true intention of statutes and constitutions, and "whenever that intention can be indubitably ascertained from allowed signs and by admitted means, courts are bound to give it effect, whatever may be their opinion of its wisdom or policy."  Potter's Dwar. Stat. 178.  This intention is, in the first instance, to be collected from the words used,—reading the law according to the natural and obvious import of its language, without resorting to a subtle and forced construction, either for the purpose of limiting or extending its operation.— *Waller v. Harris* 20 Wend. 561.  But, as a proper guide to this end, it is frequently of the highest importance to consider, what was the state of the case before the adoption of the given statute or constitutional clause under investigation, and also what was the mischief or defect, against which it failed to provide.  This involves a consideration also of the *remedy* provided, and the *true reason* of it. Potter's Dwar. Stat. 184.  This has been well denominated by Lord Coke as "the very lock and key to set open the windows of the statute."—2 Inst. 301.

The history and nature of laws authorizing imprisonment for debt and *torts* at common law, throw no inconsiderable light upon the present question, and ought, for this reason, to be kept in view in our efforts to arrive at a proper conclusion. Cooley's Const. Lim. 74.  And it is accordingly a significant fact, that, in the early history of the common law, while the King, as plaintiff in any action, whether for *debt* or *tort*, had an execution against the defendant's property and body, no other person besides him was entitled to process against his body except in actions of trespass *vi et armis*.  This remedy was not then permitted in actions of *debt*.  *Harbert's case*, 3 Co. 12, *a*.  The extension of this right to other forms of action was the gradual work of Parliamentary legislation, between the thirteenth and sixteenth centuries.  The ancient

[Ex parte John Hardy.]

mandate of the writ of *capias ad satisfaciendum* required the sheriff to " take and *keep* the body [of the defendant] so that he may have it on the return day of the writ at Westminster, to satisfy the plaintiffs of their damages, costs and charges." And the defendant being taken, remained in custody, until he satisfied the plaintiff's demand, and was released so soon as he did so.—Tidd's Prac. 1028–29. At common law, then, the imprisonment of the debtor was simply a process of physical duress by incarceration, by means of which he, or his friends through sympathy for him, were coerced into paying the debt, and possibly also it may have been originally designed to be somewhat punitive in its purposes. In *Sturgess v. Crowninshield,* 4 Wheat. 122, it was said by MARSHALL C. J. that " confinement of the debtor may be a *punishment* for not performing his contract, or may be allowed as a *means of inducing him to perform it.*"

From 1819 up to 1868, a period of nearly fifty years, this method of duress in civil actions except in the matter of preliminary bail, was permitted in this State only in *cases of fraud,* and the debtor was then forbidden to "be detained in prison *after delivering up his estate* for the benefit of creditors, in such manner as shall be prescribed by law."—Const. 1819, Art. 1, § 18 ; Const. 1861, Art. 1, § 18 ; Const. 1865, Art. 1, § 22.

The legislative interpretation of these several constitutional provisions, which are identical in language, is of weighty consideration, and receives yet greater emphasis from the cotemporaneous exposition of the Bar, and the acquiesence of the Bench. *Contemporanea expositio est optima et fortissima in lege.*—2 Inst. 11 ; Cooley's Const. Lim. 81. During this period of time imprisonment for debt was not authorized in Alabama, except in cases of *fraud,* and save for a time only on preliminary bail, where the defendant was about to *abscond* ; or had *fraudulently* conveyed his property, or was about to do so ; or where he had money, property or effects liable to satisfy his debts which he *fraudulently* withheld.—Aiken's Dig. p. 49–50, §§ 1–10. Clay's Dig. 70–75, §§ 1–19 ; Code, 1852, §§ 2175–91; Rev. Code, 1867, §§ 2574–92.

This legislation, it is manifest, was intended to impart legal and vital force to the *excepted cases,* engrafted on the debt-imprisonment clause in the State constitutions then existing, permitting the body of the debtor to be taken in arrest in certain specified contingencies. Cases of fraud were understood to be an exception to the general prohibition against such imprisonment, and the rule is cogent that the designation by mention of one class of exceptions is a refusal to include within the scope of the exception all others. Apart

[Ex parte John Hardy.]

from the operative influence of the exception, cases of fraud would seem clearly to come within the general rule.

Such was the state of the law when the constitution of 1868 was adopted. It was then declared by that instrument, for the first time in the history of the State, that " no person shall be *imprisoned for debt*."—Art. 1, § 22, (Decl. Rights). Nearly eight years later the same guaranty to the liberty of the citizen was secured and re-affirmed, in like words, by the constitution of 1875. Art. 1, § 21, (Decl. Rights). No exception is made in cases of fraud, or otherwise. Legislative caution, indeed, seems to be precise and exact in the intentional exclusion of such cases, which for so long had previously been recognized in theory, and constantly acted on in practice. The constitutional prohibition is general; the guaranty in its words is universal, unless the spirit and reason of the mandate can, by legitimate construction, be made to rescue certain cases from its letter.

Interpreting the two last constitutions in the light of the former three, we can scarcely conclude that absolutely nothing was intended or effected by this change. "The prior state of the law," says a learned writer on constitutional law, " will sometimes furnish the clue to the real meaning of an ambiguous provision, and it is especially important to look into it, if the constitution is the successor of another, and in the particular in question essential changes have apparently been made".—Cooley's Const. Lim. (4th Ed.) 79-80. Imprisonment for debt had been long prohibited ; but imprisonment for debt in cases of fraud was specially permitted. In these cases alone, so fully described in the details of legislation, was the incarceration of the debtor's body authorized to compel the payment of the debt. If the deliberate omission of this exception from the two last constitutions is not permitted to operate on the cases formerly construed to come within the exception, then there is no scope for it, the change is nugatory, and the striking out of the exception means nothing.

Accordingly, when the Code of 1876 was adopted and promulgated, all laws contained in previous Codes, authorizing imprisonment for debt, were omitted by the Codifiers, and this omission was ratified by the legislature, thus recognizing their repugnancy to the amended constitution. This, in other words, was an emphatic legislative affirmation of the fact, that the whole system of imprisonment "for *debt*," with its machinery of duress, had been abolished and swept away by the constitutions of 1868 and 1875.

But it is argued, that this change was not intended to interfere with the traditional power of chancery courts to punish

[Ex parte John Hardy.]

for contempt all refusals to obey their lawful decrees and orders, and that these tribunals of justice have, from the most ancient period of their existence, exercised the right to force the payment of money, or the delivery or transfer of property, by one suitor to another.—2 Dan. Ch. Pr. 1045-6. This proposition may be conceded to be sound without affecting the case at bar in any respect. The power in question was never exercised by chancery courts, except in those cases where a trust in the property or fund arose between the parties litigant, or some specific interest in it was claimed, or the chattel had such peculiar value and importance that a recovery of damages at law for its detention or conversion was inadequate. Such interference was in the nature of a bill *quia timet,* and was asserted only on a proper showing that the fund or property was in danger of loss or destruction. No jurisdiction to compel the payment of an ordinary money demand, unconnected with such peculiar equities, ever existed in chancery courts, nor had they the power to compel such payment by punishing the refusal to pay under the guise of a contempt. The act authorizing it is a clear and sweeping innovation upon established equity jurisdiction. 1 Story's Eq. Jur. §§ 708-710 ; 2 Story's Eq. Jur. §§ 839-845 ; *Insur. Co. v. Dickinson,* 38 Ill. 289.

The case of *Wightman v. Wightman,* 45 Ill. 167, involved the construction of a clause in the constitution of the State of Illinois similar to our own. The chancery court, on petition of the complainant for a divorce, had made an allowance for *alimony,* payable in semi-annual instalments. The defendant refused to pay the amounts as ordered and was attached for contempt. He claimed exemption from the process on the ground that it was an imprisonment for debt. A divided court sustained the legality of the proceeding, but placed it upon the ground that *alimony,* thus decreed to be paid, *was not a debt.* The court say : " The amount found by the decree was not originally *founded upon a contract,* and it was *such debts* only from which the debtor could claim exemption from imprisonment." WALKER J. dissented from this conclusion, the other two judges concurring in its correctness. The reason of the decision is clearly a strong argument in favor of the position that, where the claim upon which the suit was founded is a *debt,* there can be no coercion of its payment by a resort to the process of contempt. The Supreme Court of Missouri held in *Coughlin v. Ehlert,*39 Mo. 285, that an order for the payment of alimony is simply an order for the payment of money, and could not, therefore, be enforced by imprisonment for contempt of court, incurred in refusing to obey a decree directing its payment, because imprisonment

[Ex parte John Hardy.]

for debt was abolished by the State constitution. And so, in *Roberts v. Stoner*, 18 Mo. 481, it was decided that a sequestration merely to compel the payment of money could not be enforced for the same reason.

In *Ex parte Grace*, 12 Iowa, 208, which was an application for *habeas corpus*, the petitioner sought discharge from a commitment for contempt for refusal to pay over money in his possession which he withheld in disobedience of the order of the District Court. The statute, under which that case arose, was the same, in substance, with that under which these proceedings are had. But the constitution of Iowa did not prohibit imprisonment for debt in cases of *fraud.* Such cases were made an exception. The attachment was sustained only by construing it to come within the constitutional exception. The court said: "The failure of the debtor to surrender his property, liable to execution, to the payment of the judgment, might well be *such fraud as that, within the meaning of the constitution,* he would *forfeit his right* to claim exemption from imprisonment." It was, in other words, a fraudulent withholding of his property by the defendant, which was liable to the satisfaction of his debts, a ground of fraud, which always authorized a bail writ or a *ca. sa.* under our abolished practice. The Iowa statute, however, was declared void on the ground, that it was repugnant to a clause in the constitution of the State, which declared, that "the right of trial by jury shall remain inviolate," a conclusion in which it is not necessary that we should concur for the purposes of this case. The sound principle was announced, that the legislature could not, by an *evasion* of the constitution, render that which *was in its essence a suit at law,* a proceeding to *punish for contempt.* See also *Blair's Case*, 4 Wis. 531.

The law now under consideration was originally entitled " An act to *extend the jurisdiction* of courts of chancery." Acts 1870–71 p. 34. The act imports on its face the fact, that the jurisdiction conferred was one not before possessed. It brought, as before observed, a new subject matter within the range of chancery jurisdiction. Its clear design was to provide a machinery for compelling the payment of an ordinary debt by the defendant, when he fraudulently withholds property, money or effects, which are not exempted from execution at law. The purpose of the law is to force the payment of the *debt* which is the basis of the suit. The defendant is attached and imprisoned, because he does not deliver the money or property, in order to pay the debt. If the debt is paid, the prisoner is released. If he does not deliver the property or money to the officer of the court, for the ultimate satisfaction of the complainant's debt, his imprison-

(21)

ment is continued. The indirection employed can not aid the matter, for the express prohibition of an end is also an implied prohibition of all and every means designed and used solely to reach that end. What can not be done *directly*, is also prohibited to be done *indirectly*. The payment or delivery to the register is only for the benefit of the complainant. Characterizing the refusal to pay or deliver as a contempt, does not make it such, if it appears, in its essence and nature, to be otherwise, and is merely a new legislative creation to accomplish by evasion, an unlawful or unconstitutional end.

We are of opinion that the law, in its true essence and purposes, is one authorizing, by indirection, imprisonment for debt.—*In Re Blair*, 4 Wis. 521 ; *Cotton v. Sharpstein*, 14 Wis. 226.

This conclusion is corroborated by another view of the case. So long as the body of the debtor was authorized to be taken in arrest in this State, the right was carefully regulated by law. It was permitted only in cases of fraud. The creditor was compelled to make oath to his debt, and also to the fact of some fraudulent practice on the part of the debtor. He was also required to give security for costs. The right of bail was carefully secured, and the debtor could be discharged by taking the insolvent oath and purging himself of fraud. He was also entitled to a trial by jury, which is, perhaps, at last the great sheet-anchor of Anglo-Saxon liberty.—Rev. Code §§ 2574-2592.

If the law in question is permitted to stand, a result rather startling, of necessity, must follow. A new and unexplored field of jurisdiction is extended to courts of chancery, not heretofore opened to them. The old power to imprison for debt is re-established under the guise of a new form. *All legislative safeguards against its improvident abuse will have been swept away.* No oath is required to any tangible act of fraud by the debtor. No security for costs is required. No method is provided for the rendition of the debtor's schedule of effects, nor for settling his claim of exemptions. The valuable privilege of *bail is denied him*, and he is *deprived of the right of trial by jury.*

We can not suppose that this was intended to follow by the framers of the constitution, and the law-making power that adopted the present Code. If so, the rights and liberties of the citizen have been *abridged*, and not enlarged by the amendment of the clause under consideration. The debtor is in a worse condition under the present constitution, with its general prohibition that "no person shall be imprisoned for debt," than he was under the former constitutions

providing expressly that there might, in some cases, be such imprisonment. Annulling the *exception* thus operates rather to diminish than increase the scope of the constitutional rule, and imprisonment for debt is not mitigated, but becomes more rigorous in a new phase, and harsher under the Protean form of a new name. Denominated a contempt, it is virtually unregulated by any law, in many essential details, save by the conscience of the chancellor.

We are unwilling to adopt this conclusion, and to believe that such results were intended. To do so, would be to ignore a cardinal principle of construction, which requires that constitutional provisions for the protection of life, liberty and property, are to be largely and liberally construed in favor of the citizen."—*Dorman v. State*, 34 Ala. 216.

Under these views, we are constrained to conclude, that so much of section 3889 of the Code of 1876, as authorizes the imprisonment of a debtor in the county jail for a refusal to pay or deliver to the register his money, effects or property for the payment of a complainant's judgment, is in violation of section 21, Art. 1 of the constitution, and therefore null and void. An order committing a defendant for contempt for such refusal is an *imprisonment for debt*, and as such is prohibited by said section of the Declaration of Rights. Whether the provisions of this law, in its present shape, are so separable as to authorize such imprisonment, where the complainant's judgment is founded on *tort*, while at the same time it is void as applicable to those founded on *contract*, is a question not now before us, and which we are not called on to decide.

The writ of *habeas corpus* and *certiorari* will be awarded by this court to bring the petitioner before us, together with the proceedings had before the chancellor, unless on another application renewed before him, he shall order the petitioner to be discharged from custody.—*Ex parte Moore* 62 Ala. 471.

STONE, J. *concurring.*

BRICKELL, C. J. *dissenting.*—I am constrained to dissent from the opinion and judgment of the court, and, as briefly as I can, will state the reasons of my dissent, and my views of the case.

The relator is imprisoned by virtue of a writ of attachment, issuing from the City Court of Selma, founded on an order of the court, adjudging him guilty of a contempt for failing to obey a decree rendered in a cause, to which he was a party defendant, ascertaining and adjudging that he had

in his possession a certain number of United States bonds of a particular denomination, which were subject to the payment of judgments at law in favor of the complainants in said cause, and further adjudging that, by a day specified, he pay such judgments, or failing therein, deliver to the clerk and register of said court so many of said bonds as would be sufficient for the payment. It is shown by the writ, that the relator had notice of the decree, and failed to obey it. Imprisoned under this writ, on behalf of the relator, an application was made to the Chancellor of the Eastern Division, for a writ of *habeas corpus*, which was issued. On the hearing of the writ, the sheriff of the county of Dallas having custody of the relator, and to whom the writ of attachment was directed, made return of that writ, as the cause of the detention and imprisonment. The chancellor refused to discharge the relator, ordering that he be remanded to the custody of the sheriff. The application is now in this court renewed.

It is of some importance to ascertain the precise character and nature of the jurisdiction the court is invoked to exercise. Since the case of *Ex parte Simonton,* 9 Port. 383, it has been regarded as settled, that this court has not original power to award a writ of *habeas corpus*. From this court the writ may issue, only when necessary in the exercise of the "general superintendence and control of inferior jurisdictions," with which it is clothed by the constitution.—*Cheney, Ex parte,* 8 Ala. 424; *Ex parte Croom,* 19 Ala. 561; *Ex parte Burnett,* 30 Ala. 461. The necessity which will authorize the issue of the writ from this court does not exist, unless some court, or the judge of some court, invested with jurisdiction to act in the premises, has undertaken to decide upon the case of a party aggrieved, or else, without any just cause therefor, has refused to entertain the same. The practice to be pursued in obtaining the writ from this court was very deliberately and carefully prescribed in *Ex parte Croom, supra*. The party aggrieved by the action, or the refusal of the inferior jurisdiction to act, must on oath present a petition or application to this court, disclosing a state of case which will show that the inferior jurisdiction has erred to his prejudice, *and that upon the case made before that jurisdiction,* he is entitled to the relief he seeks. It is appellate jurisdiction this court exercises; and the only inquiry which can be entered upon is, whether, upon the facts before it, the inferior jurisdiction has erred to the prejudice of the petitioner. A new case can not be made in this court,—deficiencies in the case presented to the inferior jurisdiction, if any there be, can not be supplied. Whether, upon the case and facts before it, that jurisdiction has erred, I repeat, is the whole

[Ex parte John Hardy.]

scope of inquiry in this court. In *Ex parte Cleveland*, 36 Ala. 306, which, like this case, was an application for a writ of *habeas corpus*, this court said : "The facts which were made to appear to Judge Rapier, are not brought to our notice ; and, hence, we are not able to say on what facts he based his decision. This, of itself, is enough to require us to withhold the writ. We can not say that he erred, unless we know upon what facts he pronounced judgment."

What were the facts before the chancellor, except the return of the sheriff to the writ of *habeas corpus*, this court is not informed otherwise than by the petition here filed. No exception was taken to his judgment, no statement of the facts upon which the judgment was founded, is certified to this court in any authentic form. The petition here filed alleges that the writ of attachment was founded on a decree, rendered by the City Court on a bill filed on the equity side of the court, containing particular allegations. But it is not the office of the petition to this court to certify the facts which were before the chancellor ; that is the office of a bill of exceptions or some statement certified by the chancellor. There can be, on the case now presented, in this court, but a single inquiry, and that inquiry is, whether the process vouched as the cause of the detention of the relator is void,—whether it emanated from a court having jurisdiction to employ it.

The City Court of Selma "is an inferior court of law and equity," ordained and established by the General Assembly, in the exercise of the power with which it is clothed by the first and thirteenth sections of the sixth article of the State constitution. While it is denominated an inferior court, it is not, in a technical sense, such a tribunal. It is not of special and limited jurisdiction, bound, at the peril of having its judgments disregarded, to show its jurisdiction upon the face of its proceedings. All courts from which an appeal lies are inferior courts in relation to the appellate courts before which their judgments may be carried, but they are not, therefore, inferior courts in the technical sense of the words. Because of its subordination to this tribunal,—because its judgments and decrees may be here reviewed, and reversed or affirmed—the city court is an *inferior court*, and not in consequence of the nature and character of its constitution and jurisdiction.—*Nugent v. The State*, 18 Ala. 521 ; *Ex parte Roundtree*, 51 Ala. 42. The statute creating and establishing the court invests it with " the powers and jurisdiction which are now, or may hereafter be conferred by law on the several circuit and chancery courts of this State." When exercising powers and jurisdiction pertaining to courts of law, it is required to conform to the practice and procedure

prevailing in circuit courts; and when exercising the power and jurisdiction of a court of equity, it must conform to the practice and procedure of those courts in this State.—Pamph. Acts, 1875-6, p. 386.

The constitution ordains and establishes courts of equity, without defining the jurisdiction they are to exercise. The consequence is, that the jurisdiction of the court, so far as is consistent with our form of goverment, and our institutions, embraces the same objects, is derived from, and co-extensive with that of the English Court of Chancery.—1 Story's Equity, Jur. § 57; *Carter v. Balfour,* 19 Ala. 814; *Waldron v. Simmons,* 28 Ala. 629; *Goodman v. Winter,* 64 Ala. 410. The jurisdiction is exercised in the modes pertaining to the English courts, and the practice and procedure of those courts are observed, so far as not changed, altered, or modified by statute, or by rules prescribed by this court.—1 Story's Equity Jur. § 58. In addition to the original jurisdiction of a court of equity, statutes have been enacted extending and enlarging its powers and jurisdiction. Whatever of power or jurisdiction, original or statutory, a court of equity may possess, the City Court may rightfully exercise, and in its administration must observe the practice and procedure, and employ the remedies courts of equity may observe and employ.

Originally, in the absence of statutes providing otherwise, and providing other remedies, decrees of courts of equity, of whatever kind or nature, operated strictly and exclusively *in personam.* The only remedy for their enforcement was by what was and is termed process of contempt, under which the party failing to obey them was arrested and imprisoned, until he yielded obedience, or purged the contempt by showing that disobedience was not wilful, but the result of inability not produced by his own fault or contumacy.— *O'Callaghan v. O'Callaghan,* 69 Ill. 552. In *Mitchel v. Bunch* (2 Paige, 615), said CH. WALWORTH: "The original and primary jurisdiction of this court was *in personam* merely. The writ of assistance to deliver possession, and even the sequestration to compel the performance of a decree, are comparatively of recent origin. The jurisdiction of the court was exercised for several centuries by the simple proceeding of attachment against the bodies of the parties, to compel obedience to its orders and decrees." In this respect, the proceedings of courts of equity differed materially from those of courts of law, where the writs by which execution of their judgments is compelled are not founded on any contempt of the court committed by the defendant, but are considered as a means of satisfying the plaintiff.—2 Dan'l Ch. Pr. (30 Perkins' Am. Ed.), 1045-1054. This plain difference in the theory,

[Ex parte John Hardy.]

nature and character of the remedy in equity for the enforce-
ment of decrees, and the remedy at law for the enforcement
of judgments, it is important to bear in mind in the consid-
eration of all the questions this cause is supposed to involve.

The statutes now authorize a court of equity to issue all
writs for the collection of money, or to obtain possession of
land or personal property, which are in use in the common
law courts.—Code of 1876, § 3906. Under acts of Par-
liament the English courts of chancery may employ like pro-
cess, but thereby the ordinary remedies of the court are not
excluded or superseded.—2 Dan. Ch. Pr. 1057. Upon prin-
ciple, such remedies, given by statute, are merely cumulative.
—Sedgw. Stat. & Const. Law, 75, 100, n, 341-45. Our stat-
utes expressly provide, that "courts of chancery are author-
ized to issue such process, mesne and final, as has been used
in such courts."—Code of 1876, § 3906; and it is further
provided, that "courts of chancery may also enforce their
decrees, orders and rules by process of attachment against
the party or officer in contempt, or by process of seques-
tration against his property."—Code of 1876, § 3901. The
clear legislative intent is manifest to enlarge and render
more efficacious equitable remedies, while preserving the
remedies the courts had employed in the absence of statutes
providing others.

The process of attachment is termed process of contempt,
and in theory it is founded on the offence given the court by
the failure to obey its rules, orders, or decrees. Contempts
of court, it may be said, are of different species. *Direct* con-
tempts, as they are termed, consist of open insults to the
court, or to the persons of the judges there presiding. *Con-
sequential* or *constructive* contempts, not committed *in facie
curiæ*, but acts or words "plainly tending to create a universal
disregard of their authority," are each, as is said in the opin-
ion of the court, "in the nature of a special criminal offence,
and proceedings for their punishment are in the nature of
criminal procedure." Blackstone treats them as misdemean-
ors, of which there may be summary conviction and punish-
ment. If the contempt imputed by the attachment against
the relator is of this character,—if the proceeding for its pun-
ishment is a criminal procedure, it could not fall within the
constitutional interdiction of imprisonment for debt, which is
directed entirely against mere civil procedure, in civil actions.
*Morgan v. State*, 47 Ala. 34; *Caldwell v. State*, 55 Ala. 133.
But the contempts and the procedure to punish them, which
are *quasi* criminal, are distinguishable from the contempts
imputed, and the process of attachment employed by a court
of equity to enforce its orders, rules and decrees for the ben-

[Ex parte John Hardy.]

efit or protection of its suitors; or from the contempt a party to a suit at law may commit, in disobeying rules or orders made in the progress of a cause in the interest of a party. The process of attachment, in either instance, is but a civil execution for the benefit of the party injured or in interest.—4 Black. Com. 285; *Snelling v. Watrous*, 2 Paige 314. Of such attachments, it is said, in *Rex v. Stokes* (1 Cowper, 136), that the writ is a mere execution in a civil suit,—"a matter solely between party and party."

In *Ex parte Thurmond* (1 Bailey, S. C. 605), an attachment is defined as "a process issued from a court of record, to punish any person concerned in, or attendant on the administration of justice, for misconduct, malpractice or neglect of duty; and to compel a performance of its orders, judgments, or decrees, interlocutory or final;" and "where it issues to compel a party to a suit to pay an award or a decree of a court of equity, or against a security for the costs of a suit, and the like," it is civil process. The attachment, being the only remedy a court of equity originally employed to enforce its decrees, is, of necessity, mere civil process.—*Buck v. Buck*, 60 Ill. 105. When it is necessary to distinguish between a civil and a criminal proceeding for contempt, the criterion is very clearly stated in a recent decision. If the contempt consists in the refusal of a party to do something which he is ordered to do for the benefit of the opposite party, the process is civil, and he stands committed until he obeys the order. In such case the order is not *punitive*,—it is simply *coercive*. When the contempt consists in his doing a forbidden act, injurious to the opposite party, the process is criminal, and the conviction is followed by a fine, or a penalty, or imprisonment, or both, and is purely *punitive*.—*Phillips v. Welch*, 11 Nev. 187. When the process is civil, inability to perform, the party not having voluntarily and contumaciously disabled himself from performing, will excuse and relieve from imprisonment.—*Meyers v. Trimble*, 3 E. D. Smith (N. Y.), 607; *Galland v. Galland*, 44 Cal. 475; *Carlton v. Carlton*, 44 Ga. 216; *Smith v. McLendon*, 59 *Ib.* 523; *Wightman v. Wightman*, 45 Ill. 167.

It is obvious, the statutes treat an attachment, issuing as this writ was issued, to compel performance of an act, which the court has decreed the one party to perform for the benefit of the other, as a mere civil process to be employed at the election of parties. Such a decree must specify the time within which the act is to be performed; and if there is a failure to perform, the process can only issue on the affidavit of non-performance, filed by the party for whose benefit the decree was rendered.—Code of 1876, §§ 3902-04.

[Ex parte John Hardy.]

The "City Court of Selma," clothed with the power and jurisdiction of a court of equity, and, when sitting as such court, having authority to issue an attachment against the body of a party disobeying its orders, rules, or decrees, had jurisdiction of the process, and authority to issue the writ, under which the relator is imprisoned. Whether a case existed, in which the jurisdiction and authority should be exercised, the court was invoked, and was bound to determine. The relator being imprisoned under this process, the statute requires that a *habeas corpus* to inquire into the legality of the imprisonment, shall be heard by the judge of the City Court, a circuit judge, or a chancellor.—Code of 1876, § 4940. By its own terms, the statute, in affirmation of the common law, excepts from the right to and benefit of the writ of *habeas corpus*, all who are imprisoned by any order, judgment, decree or process of any court legally constituted, or committed for contempt, according to law, the contempt being charged in the commitment. The words of the statute are: "No court, chancellor, or judge, on the return of a writ of *habeas corpus*, has authority to inquire into the legality or justice of any order, judgment, decree or process of any court legally constituted, or into the justice or propriety of any commitment for contempt made by a court, officer, or body according to law, and charged in such commitment."—Code of 1876, § 4961. The exception seems to me to apply particularly and peculiarly to the case made by the application to the chancellor, whose judgment thereon rendered this court is asked to revise and reverse. The relator is detained in prison by virtue of the order and process of a court of general jurisdiction. It seems to me, if the order for the issue of the process can be re-examined, and, in effect, reversed and annulled, and the process vacated upon a writ of *habeas corpus*, when drawn in question collaterally, by a single judge, not of superior, but of co-ordinate jurisdiction, sitting in vacation, as was said by C. J. GIBSON, in *Com. v. Leckey* (1 Watts, 66), "some very curious judicial phenomena" will be presented; and some of the wisest and most conservative principles of the law, essential to the security of parties, the quieting of litigation, and the efficient administration of justice, inviolable in all other procedure, must be disregarded. A judge may, in vacation, re-open and reverse the judgments he had rendered in term time, which he could not re-examine while sitting as a court, though error and irregularity may be apparent upon the most casual examination of the record. Not only his own judgments, but the judgments of co-ordinate jurisdictions, pronounced after the most careful and patient deliberation, after full opportunity of contestation

[Ex parte John Hardy.]

had been afforded all parties affected by them, even after, by the lapse of time, they had become free from examination in an appellate tribunal, may be set at naught and nullified. The statute authorizing the city court judge, a circuit judge, or a chancellor, to inquire on *habeas corpus* into the legality of imprisonment, authorizes the inquiry when the detention is under the sentence and process of this court equally with the sentence of a city, circuit or chancery court. Can it be, that the judgments of this, the highest court in the land, are thereby subjected to re-examination by the judges of inferior courts, exercising judicial authority summarily, and the very questions and matters this court has adjudicated after the parties have had full opportunity to be heard, re-opened and re-judged? If this were possible, judicial proceedings might run into incurable disorder,—might become labyrinths of perplexing confusion; conflict and collision provoked between co-equal, and between superior and inferior jurisdictions; and the writ of *habeas corpus*, perverted from its legitimate and beneficent use, would become an instrumentality for the subversion of law and order.

The office of a writ of *habeas corpus*, the scope of inquiry it opens, is not by the law left in doubt and uncertainty; it is distinctly marked and clearly defined. In the *Passmore Williamson* case (26 Penn. State, 9), which was of peculiar interest because of its relation to vexed political questions then disturbing the country, and which will remain of permanent interest, because of the learning and ability characterizing the opinions pronounced, the province of the writ was thus defined by BLACK, J : "A *habeas corpus* is not a writ of error. It can not bring a case before us in such a manner that we can exercise any kind of appellate jurisdiction in it. On *habeas corpus* the judgment even of a subordinate State court can not be disregarded, reversed, or set aside, however clearly we may perceive it to be erroneous, and however plain it may be that we ought to reverse it, if it was before us on appeal or writ of error. We can only look to the record to see whether a judgment exists, and have no power to say whether it is right or wrong. It is conclusively presumed to be right, until it is regularly brought up for revision." And LOWRIE, J. said: "The *habeas corpus* was not intended, and could not be intended to authorize the superior judges, being substantially those of the higher courts of record, to interfere with the jurisdiction of each other. The purpose of the writ was satisfied, when the jurisdiction of the superior courts attached, for the State could not know any better means of securing a fair and impartial trial. If that, with the ordinary provisions for the correction of errors, was not sufficient, then

VOL. LXVIII.

humanity has only to acknowledge its incapacity to provide entirely against error and injustice. Certainly, the *habeas corpus* was not intended to provide a remedy against the unjust judgments or sentences of the higher courts; and when it is asked for, for such a purpose, it ought to be refused."

In *State v. Towle*, 42 N. H. 540, referred to in the opinion of the court, it is said: "There is no doubt of the power of the court to look into the proceedings, so far as to see whether the court pronouncing sentence had jurisdiction to do it. If it be found that it had no jurisdiction, its judgment is void, and on *habeas corpus* the person imprisoned under it will be discharged. *But if the court had jurisdiction of the subject-matter and the party*, its judgment is final and conclusive, and must stand until revised by appeal, writ of error, *certiorari*, instituted for that purpose; and can not be examined and revised collaterally by the writ of *habeas corpus*."

The decree of the City Court adjudging, that the relator should deliver the United States bonds for the payment of the judgments, and subsequently adjudging his failure to deliver them a contempt of court, and awarding process for his arrest and imprisonment, are either void, because the court was without jurisdiction of the person of the relator, or of the subject-matter; or, however erroneous they may be, incapable of impeachment collaterally; and it is collaterally only, that they were drawn in question upon the *habeas corpus* before the chancellor. No principle of law is more essential to the efficient administration of justice, and the preservation of the dignity of judicial proceedings, and is more universal and inflexible in its operation, than that when a record or process is drawn in question collaterally, it can not be invalidated for error or irregularity. And another principle of as much importance is, that a court, having jurisdiction, has the right, and is under the *duty* of deciding every question which arises in the cause; and whether its decision be correct or otherwise, its judgment, until reversed, is regarded as binding and conclusive in every other court. Hurd on *Habeas Corpus*, 334–5; *Wilcox v. Jackson*, 13 Peters, 511. In the *Passmore Williamson Case*, *supra*, said BLACK, J.: "Every judgment must be conclusive until reversed. Such is the character, nature, and essence of all judgments. If it be not conclusive, it is not a judgment. A court must either have power to settle a given question finally and forever, so as to preclude any further inquiry upon it, or else it has no power to make any decision at all. To say that a court may determine a matter, and that another court may regard the same matter afterwards as open and undetermined, is an absurdity in terms."

[Ex parte John Hardy.]

When the chancellor rendered the judgment remanding the relator, there was before him no more than the return of the sheriff, vouching, as the cause of imprisonment, the writ of attachment issuing from the City Court. The return could have been controverted, and, if controverted, could have been supported by evidence *aliunde*. Not being controverted, as it was the act of a sworn public officer, in the line of official duty, the presumption is of its truth. *Ex parte Hunter*, 39 Ala. 560. The only inquiry upon which the chancellor could enter, was, whether the court had jurisdiction to issue the process, *upon any state of facts, and under any circumstances. If* the court had the jurisdiction, all other inquiries were precluded by the decree awarding the writ; for that decree put an end to such injuiries by deciding them. *Ex parte Watkins*, 3 Peters, 193. The decision may have been erroneous ; the facts and circumstances may not have existed authorizing the use of compulsory process against the body of the relator ; the remedy for the correction of the error was not disobedience to the decree, and a resort to the writ of *habeas corpus* for relief from imprisonment under it, but the ordinary remedies for the correction of errors ought to have been pursued. In *People v. Sturtevant*, 5 Seld. (N. Y.) 263, referred to in the opinion of the court, it is said : " The method of correcting error is by appeal, and not by disobedience. A party proceeded against for disobedience to an order or judgment, is never allowed to allege, as a defense for his misconduct, that the court erred in its judgment. He must go further, and make out that, in point of law, there was no order, and no disobedience, *by showing that the court had no right to judge between the parties on the subject.*" If, when courts are compelled to adjudge whether a cause lies within their appointed jurisdiction, the judgment, because erroneous, could at pleasure be disobeyed and defied by a refractory suitor, the impotency of the courts would soon sink them into contempt and insignificance. It may be said, that every suit in equity involves primarily an inquiry into the jurisdiction of the court,—whether, for the particular cause of suit, there is a plain and adequate remedy at law. There is no question, often of greater nicety and difficulty. Now, if, in every instance in which the court may err in adjudging in favor of its own jurisdiction, the decrees and process of the court can be defied, impeached collaterally, set aside summarily by single judges in vacation, there is but little necessity of providing appellate courts, and remedies for the removal of causes to them, that errors may be corrected.

Looking alone to the process, the writ of attachment re-

[Ex parte John Hardy.]

turned as the authority for the detention of the relator, I am unable to perceive any ground for pronouncing the decree on which it purports, according to its recitals, to be founded, or the writ itself, void.    Beyond the return we can not look, for, if it was controverted before the chancellor, the evidence is not shown and certified to us.—*Ex parte Cleveland*, 36 Ala. 306 ; *Ex parte Carroll, Ib.* 300.    If I do not misunderstand the opinion of the court, the City Court had jurisdiction to decree a delivery of the United States bonds, and to compel obedience to the decree by the employment of this process, *if a trust, or some specific interest* in the bonds was disclosed, and in the latter case, the remedy at law for their detention or conversion was inadequate.    It may well be asked, whether the decree was not rendered, and the process awarded, in the one or the other of these cases.    On the face of the process, there is nothing to negative the fact.    The court from which it emanated is a court of general jurisdiction, not bound to disclose on its records or process the facts on which its jurisdiction in a particular case may depend.    Its judgments and process are all protected, when drawn in question collaterally, by the intendment, that nothing is without its jurisdiction but that which appears to be so specifically.    It is further said in the opinion of the court, that it is not decided, if the judgments at law were founded in *tort*, and not in *contract*, that the statute under which the proceedings were had, (or rather are assumed to have been had,) would be offensive to the constitution.    The line of argument adopted by the court, it seems to me, leads to no other conclusion, than that imprisonment of a defendant in an action for a *tort*, or to compel satisfaction of a judgment rendered in such action, may, without violating the constitution, be employed as a remedy.    This question I do not consider.    It is embarrassed with difficulties, when such a remedy may be employed to compel satisfaction of a judgment, of itself, and in itself, a debt of the highest dignity, that I must await a case presenting the question, before pronouncing judgment upon it. How can it be assumed that the judgments at law were founded on *contract*, and not on *tort* ?    There is nothing in the record affirming the one or the other fact.    By the record I mean the transcript of the proceedings before the chancellor.    Is it to be intended that they were founded on *contract*, that the chancellor may be put in error, and the proceedings in the City Court invalidated collaterally ?

But passing these considerations, it is a well established principle, that where a court has jurisdiction under particular circumstances, or of a particular class of cases, error in adjudging the existence of the circumstances, or

[Ex parte John Hardy.]

in adjudging that a particular case is of the class to which its jurisdiction extends, does not render the judgment void and assailable collaterally. It is subject to be reversed; but, until reversed, it is binding and conclusive. *Coltart v. Allen*, 40 Ala. 155. The principle is as applicable to the procedure on *habeas corpus*, as to any other judicial proceeding. In the *Tweed Case*, (60 N. Y. 569), speaking of the persons excepted by the statute from the benefit of the writ of *habeas corpus*, the statutory exception corresponding substantially with that found in our statutes, the court said : " To bar the applicant from a discharge from arrest by virtue of a judgment or decree, or an execution thereon, the court in which the judgment or decree is given, must have had jurisdiction to render such judgment. *The tribunal must be competent to render the judgment under some circumstances.* · · · · If the record shows that the judgment is not merely erroneous, but such as could not, *under any circumstances, or upon any state of facts*, have been pronounced, the case is not within the exception of the statute, and the applicant must be discharged. If the judgment is merely erroneous, the court having given a wrong judgment, when it had jurisdiction, the party aggrieved can only have relief by writ of error, or other process of review. He can not be relieved summarily by *habeas corpus*."

In *Ex parte Cohen* (5 Cal. 494), the relator was imprisoned for disobedience to an order rendered in a cause to which he was not a party, commanding him to deliver specific chattels to a receiver, and sought to be liberated on *habeas corpus*. The court, confining itself to the single point of the jurisdiction of the court making the order, said : " In the examination of this question, we should be careful to distinguish between the erroneous exercise of a power conferred by law, and the usurpation of power. If the district court *has jurisdiction, under any circumstances*, to make an order requiring persons, not parties to the record, to deliver property to the officers of the court, the issuance of such order in an improper case would be error, certainly, which an appellate court would correct, but would not be an usurpation of power, or an excess of jurisdiction." Now, if I concurred in the other views expressed in the opinion of the court, I would be compelled to the conclusion, fatal to the discharge of the relator, that the City Court had simply erred in adjudging that its jurisdiction extended to a case not within the class of cases, of which it had rightful jurisdiction.

But passing to another view of the case, the relator is imprisoned under process expressly reciting on its face that he was guilty of a contempt in the disobedience of an order the

[Ex parte John Hardy.]

City Court had pronounced. Since *Brass Crosby's Case* (3 Wilson, 188), the law has been settled, that when a superior court commits a party for a contempt,—and it is immaterial whether the contempt is criminal in its nature, or the mere disobedience to an order made in a cause for the benefit of a party— the adjudication of the court is a conviction, the commitment is execution, and the party committed is excepted from the benefit of the writ of *habeas corpus*. *Ex parte McCullough,* 35 Cal. 97. Of course, no court can, by mere adjudication, convert that into contempt, which is not of such nature and character in contemplation of law, any more than it can, by an adjudication, make a crime of facts which, in themselves, are innocent, or insufficient in law to constitute a crime. But when the court has the jurisdiction to determine what is a contempt, or the facts constituting a crime, the error of adjudication does not render the judgment void, or subject to collateral impeachment. In *Crosby's Case,* he was imprisoned for contempt by the House of Commons. Upon return of the writ of *habeas corpus,* the causes of contempt were set forth; and of other grounds on which a discharge was claimed, it was insisted the causes assigned were insufficient. But the whole court were of opinion, that they were without power to revise the adjudication of the House of Commons. The City Court assuredly had jurisdiction to determine, whether a contempt of its authority had been committed by the relator; in the judgment rendered, it was not usurping or exceeding its jurisdiction; and if the facts recited in the process do not constitute a contempt, the court has merely erred in its judgment of the law applicable to the facts.

That a writ of *habeas corpus* is not an appropriate remedy to examine into the sufficiency of a commitment for contempt by a court of competent jurisdiction, and, if granted, that no inquiry will be made into the causes of contempt which are assigned in the commitment, is the principle distinctly announced, and supported by numerous authorities cited in the opinion of the court in *State v. Towle,* 42 N. H. 540. If it be that the imprisonment of the relator is in violation of the constitutional interdiction of imprisonment for debt, the imprisonment is, nevertheless, under the decree and process of a court which had the jurisdiction to decide that very question, and has decided it. If there be error in the decision, the remedy for its correction is not by *habeas corpus. Passmore Williamson's Case, supra; Ex parte Kearney,* 7 Wheat. 38 ; *Ex parte McCullough,* 35 Cal. 97. These views, if they prevailed, would be decisive of the case, and there would be impropriety in passing to the consideration of other questions. The argument of counsel has proceeded upon the hypothesis, which

[*Ex parte John Hardy.*]

the court has assumed, and made the basis of decision, that the attachment is founded on a decree rendered on a creditor's bill, filed in pursuance of the statute, forming §§ 3887–89 of the Code of 1876. It is, of consequence, necessary to consider the case in this view.

This statute authorizes a judgment creditor, who has exhausted legal remedies, his assignee, or personal representative, to file a bill in chancery in the district of the residence of the defendant, or in the district in which judgment was rendered, for a discovery of property, money, or effects liable to the payment of the debt. A general averment in the bill, that the defendant has such property, money, or effects, is made sufficient; and the defendant is required to answer, on oath, what property he may have, the nature thereof, in whose hands it is, and where situated. If it appears to the court from the answer of the defendant, or from other evidence, that he has money, property, or other effects, subject to the payment of debts, in or out of the State, a decree must be rendered, requiring him, within a specified time, to deliver the same to the register, and in term time, or vacation, all necessary orders may be made for the collection and recovery of such money or effects, If the defendant fails to comply with the decree, upon the report of the fact of failure by the register, he may be imprisoned until he obeys.

I am not able to concur in the severe arraignment to which the court subjects this statute, nor in its repeated denunciation, as " a new legislative creation to accomplish, by evasion, an unlawful or unconstitutional end," or as reviving or reestablishing imprisonment for debt, "under the guise of a new form." The whole purpose of the statute is the subjection of the property, money, or effects of a debtor, which an execution at law has failed to reach, and which is liable to the payment of debts. If it be not, in all its purposes and its remedies, distinguished from *imprisonment for debt*, as it was ever known or practiced, I have misunderstood and misread the common law, and the statutes which authorized and regulated such imprisonment. It is said, in the opinion of the court: "If this law in question is permitted to stand, a result rather startling, of necessity, must follow. A new and unexplored field of jurisdiction is extended to courts of chancery, not heretofore opened to them. The old power to imprison for debt is re-established under the guise of a new form. All legislative safeguards against its improvident abuse will have been swept away. No oath is required to any tangible act of fraud by the debtor. No security for costs is required. No method is provided for the rendition of the debtor's schedule of effects, nor for settling his claim of

[Ex parte John Hardy.]

exemption. The valuable privilege of bail is denied him, and he is deprived of the right of trial by jury."

The respect in which the statute is supposed to open to the courts of chancery " a new and unexplored field of jurisdiction," is not distinctly stated—whether it is in the power to compel the debtor to discover and deliver assets subject to the payment of debts, or in employing process of attachment for contempt against his person, to compel him to yield obedience to the decree, so far as it orders him to deliver such assets when discovered. If this statute is not, as I conceive it, a mere regulation of a pre-existing jurisdiction of a court of equity, strictly remedial, and intended to render the jurisdiction more efficacious, I can not say, it is without the scope of legislative power, to extend the jurisdiction of a court, either of law or equity, to "new and unexplored fields." Such an extension, if we admeasure our judicial system by other standards than such as are of legislative creation, and of judicial recognition in all the growth of the system, is not a novelty, or offensive to the limitation of legislative power. That the statute is simply a regulation of a well established and well defined jurisdiction of a court of equity, and authorizes the court to employ, in the administration of the jurisdiction, the ordinary remedy employed to enforce its decrees, is a proposition I shall hereafter maintain. The legislative safeguards against the improvident abuse of the jurisdiction the statute is supposed to confer, or of the remedy it authorizes, which, it seems, ought to have been provided, are an oath to a tangible act of fraud by the debtor, and security for the costs of suit. These, it is admitted, are *legislative safeguards;* and, of course, it rests within the wisdom of the legislature to require or dispense with them. It is not an objection, which can be of judicial consideration, to a statute establishing or regulating the jurisdiction of courts, or judicial proceedings, that such safeguards are, or are not required. As a matter of judicial history, it may not be amiss to observe, that until 1827, plaintiffs suing out bailable process at law were not required to give security for costs ; and that it was not until 1823, that a plaintiff suing out such process, in an action founded on a bill, bond, or note, was required to make any affidavit whatever ; and the oath then required was simply of the amount, that it could be known, with some degree of certainty, for what sum bail should be taken, and a disclaimer of all purpose to vex or harrass the defendant. Aik. Dig. 50–1, § § 3–7. In some judicial proceedings the statutes do require, at the time of their initiation, if extraordinary process is employed, that oaths shall be taken, averring the

(22)

justness of the cause of action, and, in particular cases, that
a necessity exists for the employment of the extraordinary
process.    All such oaths are *ex parte;* and *ex parte* oaths have
never met with judicial favor, nor has their multiplication
been encouraged.    It was long since said of them:  "They
are traps for men's consciences, and have a tendency to
lessen the reverence which ought everywhere to prevail for
that all-important and solemn obligation."    The frailty of the
security against the abuse of judicial process which they
afford, is shown by numerous cases of collateral actions com-
ing to this court, in which they have been falsified, and
because of their falsity, the party taking them mulcted in
damages and costs.    Against false imprisonment, against
vexation, injustice, or oppression, this statute affords a higher
and better security than would be afforded by such *safeguards.*
There can be no imprisonment under it, until the court has
ascertained that the debtor has money, property, or effects
subject to the payment of his debts, which for that purpose
he ought to deliver, and, of consequence, decrees the delivery.
The ascertainment is not made, the decree is not rendered,
until the debtor has had full opportunity of contestation and
defense.    Human wisdom has not, as yet, devised any greater
security against wrong and injustice, than an investigation
before a judicial tribunal, where each party has equal right
and opportunity of being heard.    Even after the decree for
the delivery of the property or effects, the debtor can not be
imprisoned, until he disobeys the decree,—until, by his own
contumacy, he defies, and places himself in contempt of the
authority of the court; and the imprisonment can continue
only so long as he remains in contempt; obedience to the
decree, a delivery of the property, will terminate it at any
time.    He is his own keeper, carrying the key of his prison,
if not in his pocket, in the mere exercise of his own will.

It seems to me scarcely just or proper to say of the statute,
that "no method is provided for the rendition of the debtor's
schedule or effects, nor for settling his claim of exemptions."
The delivery of his effects, for the payment of his debts, is
the whole purpose of the statute; and if it is made, the
debtor can never be imprisoned; and he is imprisoned simply
and wholly because he will not render his effects in payment
of his debts.    Nor is the claim of the debtor to exemptions
embarrassed or imperiled.    It is only property, money, or
effects subject to the payment of debts, which he is required
to deliver.    If not subject—if exempt by law—the statute
does not extend to them, and of them he can not be required
to make delivery.    Nor is it true, that the statute deprives
the debtor of the *valuable privilege of bail,* as it was ever con-

ferred either by the statute, or by the common law. When a defendant was arrested on a *capias ad respondendum*, originally the leading process in civil actions in this State, he was permitted to find bail for his appearance to answer, and to abide the judgment; but bail could never be given, where he was arrested upon final process, or on process of attachment for contempt, an execution of itself. Nor is a trial by jury denied him, further than it may be said to be denied in all cases in equity. The statute seems to me free from all just judicial objection, intended to secure creditors in their just rights, and founded in the policy, traceable in much of our litigation, to render the jurisdiction and remedies of courts of equity more beneficial and more adequate to the protection of creditors against the frauds of debtors, actual or constructive. It abridges no right of the debtor; it does not place him in a "worse position under the present constitution, with its general prohibition that 'no person shall be imprisoned for debt,' than he was under the former constitution." Under the statute, there is not, and can never be imprisonment for debt. Through all time, a debtor may remain delinquent, and in default in payment of his debts; all legal remedies against his property may be exhausted; this statute does not subject him to imprisonment. But when, by a regular course of judicial proceeding to which he must be a party, and have full opportunity of being heard, it is ascertained that he has money, property, or effects, subject to the payment of his debts, it will be conceded, there rests upon him a moral and legal duty to appropriate such money, property, or effects, to the satisfaction of his creditors. The legal duty springs from the principle of the common law, this court has most rigorously enforced, even to the disappointment of the expressed will of the donors of property,—that no man can or shall have a legal or equitable right to property which is not, in the absence of statutory or constitutional exemptions, subject to the payment of his debts. It is the performance of this duty the statute is intended to enforce; and it is only when it is judicially ascertained that the debtor has money, property, or effects, liable to the payment of debts, and is of ability to perform the duty, and he refuses performance, after being afforded the opportunity, that he can be imprisoned. *Then, the imprisonment is not for debt, but for the neglect and refusal to perform a moral and legal duty, performance resting in his ability.*

The whole scope of the statute, as is evident from its most casual reading, is to authorize creditors, who have exhausted remedies at law, to resort to a court of equity for the discovery of property subject to the payment of their

[Ex parte John Hardy.]

debts; and when discovered, its subjection for that purpose by the decree and process of the court. With all deference for the opinion of the court, I can not say, this is "a new and unexplored field of jurisdiction extended to courts of chancery, not heretofore opened to them." When the principle is established, that every species of property, legal or equitable, tangible or intangible, in which a debtor has a beneficial right or interest, not exempt by law, is bound for, and may be reached and applied to the satisfaction of his debts; if legal remedies fail, as they are indisputably shown to have failed, when there is a judgment at law, followed by a fruitless return of the process for its execution, the power of a court of equity must be perfectly adequate to carry the principle into effect, unless with humiliation we confess, that there are legal and equitable wrongs, for which there is no remedy.—*Edmeston v. Lyde*, 1 Paige, 637.

Since the opinion of Lord THURLOW, in *Dundas v. Dutens* (1 Vesey, Jr, 196), there has been, in England, some contrariety of opinion, whether the jurisdiction of a court of equity to reach and subject property of debtors, at the instance of creditors who have exhausted legal remedies, was not dependent on the character of the property,—whether it extended to any other property than such as was subject to execution at law; and it seems to have been settled, that, in the absence of statutes, enlarging the jurisdiction, it was only property subject to execution which could be reached. —1 Story's Eq. Jur. §367. Ch. KENT, however, asserted in *Bayard v. Hoffman,* (4 John. Ch. 450); *McDermutt v. Strong,* (*Ib.* 687) ; *Spader v. Davis,* (5 *Ib.* 280.), the contrary doctrine; maintaining that according to the antecedent and better authorities in the English Court of Chancery, the remedial justice of the court extended to every species of property, in which the debtor had a beneficial interest; for, otherwise, the debtor could convert all his visible, tangible property, all which was subject to execution, into stocks, choses in action, or other intangible property, "in defiance of his creditors, and to the utter subversion of justice." So far from the jurisdiction of the court in this respect being *new and unexplored*, he remarks in *Bayard v. Hoffman, supra*: "Indeed, this power in the court to aid the creditor at law in his execution against property not ordinarily within its reach, seems to have been the received and unquestioned doctrine in the time of Lord HARDWICKE."

In *Public Works v. Columbia College,* (17 Wallace, 530), says Justice FIELD : "The jurisdiction of a court of equity to reach the property of a debtor, justly applicable to the payment of his debts, even when there is no specific lien on the property,

is undoubted. *It is a very ancient jurisdiction*, but for its exercise the debt must be clear and undisputed, and there must exist some special circumstances requiring the interposition of the court to obtain possession of, and apply the property." The views of Ch. KENT were dissented from in *Donovan v. Finn*, (1 Hopk. 59); but they were adopted and sustained by the Court of Errors, after an exhaustive review of the English cases, in *Hadden v. Spader*, (20 John. 554); and later, they were maintained in *Edmeston v. Lyde*, (1 Paige 637), and numerous cases, by Ch. WALWORTH. "Since these decisions," observes the Supreme Court of New Hampshire, "the law has been considered settled in this country in favor of this equitable jurisdiction." *Bay State Iron Co. v. Goodall*, 39 N. H. 223. In Tennessee, the doctrine as asserted by Ch. KENT, does not seem to have been adopted, and statutes have been enacted affirmatory of it; and this may be true, possibly, of some other of the States. —*Creswell v. Smith*, 2 Tenn. Ch. 416. The weight of authority, however, is that independently of statutory provisions, a court of equity, in aid of judgment creditors, who have exhausted legal remedies, will intervene to compel a discovery of property, legal or equitable, and subject property not liable to, or which the execution at law has not reached.—Bump on Fraud. Conv. 264, 540 ; *Wright v. Petrie*, 1 Sm. & Mar. Ch. (Miss.) 282 ; *Miers v. Z. & M. T. Co.*, 11 Ohio, 274 ; *Cadwallader v. G. A. Society*, *Ib.* 292 ; *Gordon v. Lowell*, 21 Me. 257 ; *Sargent v. Salmond* 27 *Ib.* 539 ; *Bigelow v. C. S. of Middletown*, 11 Vermont, 283 ; *Waterman v. Cochran*, 12 *Ib.* 699 ; *Tappan v. Evans*, 11 N. H. 311 ; *Treadwell v. Brown*, 44 *Ib.* 551. Statutes in regulation or enlargement of the remedy have not raised a presumption, that the jurisdiction was not pre-existing, or been construed as conferring any new jurisdiction.—*Chase v. Searles*, 45 N. H. 511 ; *Child v. Brace*, 4 Paige, 309 ; *Dunlevy v. Tallmadge*, 32 N. Y. 457.

Nor can I concur in the opinion, that the statute, so far as it authorizes the court to compel obedience to its decree by process of attachment against the person of the disobedient debtor, "is a clear and sweeping innovation upon established equity jurisdiction." The converse of this proposition seems to me true. As we have seen, that process was originally the only remedy employed by a court of equity to enforce its decrees, and it is expressly preserved by the general statutes relating to equitable remedies. The court could have employed it, if the statute under consideration had been silent as to the remedy which must be pursued. Without its employment, it would often be vain and idle to render a decree that a debtor, who has been found to have money, United

[Ex parte John Hardy.]

States bonds, State bonds, or other property of like kind, subject to the demands of his creditors, should deliver it for their payment. The statute does not, as I read and understand it, confer on a court of equity jurisdiction "to compel the payment of an ordinary money demand," and "the power to compel such payment by punishing the refusal to pay under the guise of a contempt." It is difficult to conceive upon what ground such a view of the statute can be taken. The debt is established by the judgment at law; it is not contemplated, nor is it necessary, that the court shall render any decree for its payment, and it would be as proper to say, that whenever a court of equity intervenes to set aside a fraudulent conveyance, an obstacle to the enforcement of an execution at law, it is taking jurisdiction "to compel the payment of an ordinary money demand," as to say that such is the character of the jurisdiction the court exercises in pursuance of this statute. One of the controlling reasons that a court of equity refuses to intervene at the instance of a simple contract creditor (if a statute does not authorize intervention), to avoid fraudulent conveyances, is the want of jurisdiction to render a decree for the debt. That which becomes a contempt, according to the words and meaning of the statute, is not the failure or refusal to pay the debt. In default of payment the debtor may continue, from poverty and misfortune, or from a wanton dereliction of duty, and he would not stand in contempt, or in peril of imprisonment. The contempt for which imprisonment may follow, is committed only when the court has ascertained, after he has had full opportunity of being heard, that he has money, property, or effects liable for the payment of his debts, which he refuses to deliver for that purpose. It is disobedience to a decree he has the ability to obey, which constitutes the contempt, as essentially as if he had been ordered to deliver the same property to a receiver, when its title may be in question, and not the mere non-payment of a debt.

In my judgment, the statute is introductive of no other changes in the law, than authorizing the bill to be filed, at the election of the creditor, in the county in which the judgment may have been obtained, or in the county of the defendant's residence. The generality of averment in the bill, declared sufficient, it may be, is also a change in the pre-existing law. It is a fact not without its significance, that in many, if not all of the States, such *fishing* or *inquisitorial* bills, or like proceedings, intended to compel a discovery of all a debtor's property, and often a disclosure of all his dealings and transactions in reference to it, have been authorized by statutes quickly succeeding the abolition of imprison-

[Ex parte John Hardy.]

ment for debt. It was not until February 1st, 1839, that imprisonment for debt, except in cases of fraud, specified in the statute, was abolished in this State.—Meek's Supp. 105 ; Clay's Dig. 70, § 1. The jurisdiction of a court of equity to aid a judgment creditor who had exhausted legal remedies, to subject the equitable estate of the debtor, or any interests which could not be reached at law, had been long recognized. In January, 1844, the first statute was enacted, which now forms §§ 3882–85 of the Code of 1876, dispensing with the particularity of allegation necessary according to the rules of equity pleading in creditors' bills, and requiring upon mere general averments, that the debtor, or any other person made a defendant, should discover all property, money, or things in action belonging to him, or held in trust for him. The purpose of this statute, it was said in *Brown v. Bates*, 10 Ala. 432, was to afford a more searching and efficacious remedy.

The whole theory and policy of such legislation, and the necessity for it, are very well stated in 2 Barbour's Chancery Practice (2d Ed.), 149 : "After the right to coerce the debtor by imprisonment of his body was abolished, something of the kind was necessary ; otherwise, by placing his property beyond the reach of an execution at law, a debtor might set his creditor at defiance. While it is the policy of the non-imprisonment act, therefore, to relieve the unfortunate debtor from imprisonment, it is the design of the statute authorizing creditors' bills to compel him to surrender all his property and effects, equitable and legal, or so much thereof as is necessary to satisfy the just claims of his creditors, and the court of chancery will not permit him, by any shift or device, to place his property beyond their reach ; but will, upon a creditor's bill filed against him, assist the creditor to reach the debtor's property not otherwise available, and apply it to the payment of his debt."

Imprisonment for debt, as is said in the opinion of the court, was unknown to the ancient common law. There were reasons growing out of the feudal system, and the relation of lord and feudatory, the system favored, to which it would have been as repugnant as the subjection of lands to the payment of debts. It was, however, introduced by various acts of Parliament, antecedent to the immigration to, and colonization of this country. It is an underlying principle of the jurisprudence of the States of this Union deriving existence from English charters, or grants and colonization, that the common law furnishes the basis of their jurisprudence ; and of that common law, acts of Parliament enacted before the immigration, adapted to their situation, and

[Ex parte John Hardy.]

not inconsistent with the government and institutions they may have ordained, form a part.—*Barlow v. Lambert*, 28 Ala. 704; *Horton v. Sledge*, 29 Ala. 478; *Carter v. Balfour*, 19 Ala. 814. Imprisonment for debt, as a mere civil remedy, to which a creditor was entitled through a *capias ad respondendum*, a leading and original process in civil actions in courts of common law, requiring the sheriff to take and keep the body of the defendant, so that he would appear, answer the plaintiff's plaint, or declaration, and abide judgment, was adopted very extensively, if not universally, under the colonial governments, in actions of account, assumpsit, covenant, debt, and case, the common law actions *ex contractu*. Subsequent legislation on the subject was in modification or regulation of a practice already existing; and it has been said, that often " the very laws authorizing the arrest are not to be found, except by implication from those modifying and regulating the practice."—2 Amer. Ency. Title *Capias*, 497. The *capias ad satisfaciendum*, the writ issuing after judgment, commanding the sheriff to arrest the defendant, and commit him to jail until he paid the judgment, or was discharged by law, was not originally given by statute; it was an invention of the courts, upon the theory, that in every case in which a *capias ad respondendum* could issue, the plaintiff was, after judgment, entitled to execution against the body of the defendant.—Freeman on Ex. § 451. The first of our statutes touching the subject was enacted in 1807, five years after organized government was established; during which period there can be no room for doubt, that imprisonment for debt prevailed, as it was known and practiced in the English courts. The act of 1807 authorized the plaintiff to require bail *as of course*, when the action was founded on any specialty, bill, or note in writing signed by the defendant, or on the judgment of any court, foreign or domestic. In all actions of account, covenant broken, and actions founded on verbal contracts, and assumpsit in law, in which the sum due, or damages sustained, was shown by the affidavit of the plaintiff, or other credible person, bail could be required for the amount shown by the affidavit.—Laws of Ala. 28. This statute remained of force, without any change material now to notice, until December 9, 1823, more than five years after the adoption of the constitution of 1819, when it was changed so as to require that, in actions founded on any bill, bond, note, or account, the defendant should not be held to bail, unless the plaintiff, his agent, or attorney, made oath of the amount due, and that bail was not required for the purpose of vexing or harassing the defendant.—Aik. Dig. 50, § 1. This act remained of force until February 1st, 1839, when imprisonment for

[Ex parte John Hardy.]

debt was abolished, except in cases of fraud prescribed in
the statute then enacted.

The constitution of 1819 declared: "The person of a
debtor, where there is not strong presumption of fraud, shall
not be detained in prison after delivering up his estate for
the benefit of his creditors in such manner as shall be pre-
scribed by law." The constitution simply embodied in a
single sentence the substance of the territorial legislation at
the time it was framed, which, with changes and modifications
rather as to matters of detail and procedure, than otherwise,
continued of force, and was embodied in the Revised Code
of 1867; by which a debtor, arrested on civil process, mesne
or final, if he were not guilty of fraud, could obtain his re-
lease from imprisonment, on surrendering his estate for the
benefit of creditors. It is quite an error to suppose, that the
constitution of 1819 prohibited imprisonment for debt, *ex-
cept in cases of fraud.* The constitution was never so con-
strued judicially, or by legislative authority. It did not pro-
hibit imprisonment for debt. It did not limit or confine it to
cases of fraud. The debtor could be imprisoned; but his
detention was prohibited after he delivered up his estate for
the benefit of his creditors, in such manner as was prescribed
by law, *unless there was a strong presumption of fraud.* Before
delivering up his estate for the benefit of his creditors, the
constitution extended no protection,—gave no guaranty to the
debtor. After such delivery the protection and guaranty
against detention were conditional,—dependent upon the ab-
sence of a strong presumption of fraud. This was the leg-
islative interpretation of the constitution, sanctioned by the
acquiescence of this court in a long course of decisions, com-
mencing with *Allen v. White* (Minor, 289), and coming down
to *Kenan v. Carr* (10 Ala. 867), in which were involved the
statutes authorizing imprisonment for debt, on process,
mesne or final, no fraud being imputed to the defendant, all
the imputation resting upon him being default in payment of
the debt; and it was never suggested that the statutes were
violative of the constitution, or that there was a general con-
stitutional prohibition of imprisonment for debt, except in
cases of fraud. The fact is, that exception to a general pro-
hibition of imprisonment for debt, like the prohibition itself,
was introduced by the statute of February 1, 1839. It was
within the competency and possibility of legislative power,
under that constitution, to abolish entirely imprisonment for
debt, not even excepting cases of fraud, or to leave it as it
was at common law, a remedy to which parties could resort
of course, and as matter of choice. The constitution was
satisfied, if this imprisonment was not continued after the

[Ex parte John Hardy.]

debtor, in the manner prescribed by law, made delivery of his estate for the benefit of his creditors. Even then, satisfying its demands, the detention could be continued, if there was strong presumption of fraud. The court, it is manifest, has fallen into error, shown by legislative and judicial decision, in the proposition, repeated in varying form, and which seems to have been of influence in the conclusions reached, "that from 1819 to 1868, a period of nearly fifty years, this method of duress in civil actions except in the matter of preliminary bail, was permitted in this State only in cases of fraud, and the debtor was then forbidden to be detained in prison after delivering up his estate for the benefit of creditors, in such manner as shall be prescribed by law." It was not with any such view of the prior constitutions, that the present constitutional provision "that no person shall be imprisoned for debt," was introduced into the organic law. But it was with the knowledge that imprisonment for debt was a civil remedy in courts of law, existing by the common law which would prevail and be of force in the absence of constitutional or statutory limitations or prohibitions; that under the prior constitutions it had existed, as at common law, *as of course*, and it was within the power of the legislature at any time to restore it; that former constitutions had not abrogated it; that they were not directed against it, but against the *detention in prison*, a detention which must, of course, have succeeded arrest and commitment. Imprisonment for debt, like a preliminary attachment of property, was merely a part of the procedure to obtain satisfaction. It was not a part of the essential remedial right; without infringing the rights of creditors, without impairing the obligation of contracts, legislative power could modify, or take it away. Under no other than the process of courts of law having exclusive jurisdiction of debts, of the contracts it was intended to enforce, was it at or prior to the adoption of the constitution capable of being imposed. There was in it, at best, much of harshness and cruelty; and it was visited alike on the unfortunate and honest, and on the unjust, fraudulent debtor. Inability to pay the debt could not relieve from the imprisonment; its continuance depended on the mere will of the creditor; and the court had no greater power to restrain him in the use of the remedy by which it was imposed, than they had in the use of process directed only against property. There was but a brief period in which, in all its harshness and rigor, it ever existed in this State. Amelioration of the laws authorizing it, here and elsewhere, has been gradual; and now, I believe, it is abolished in England and all the States. The abolition in the

[Ex parte John Hardy.]

States is either by statutes, or by constitutional inhibition; sometimes accompanied with an exception of fraud in contracting the debt, or fraudulent attempts to evade payment. The effect of the exception is not of consideration now. I am strongly inclined to the opinion, that it is mere matter of legislative caution; and that, however general may be the terms in which the abrogation of imprisonment for debt may be expressed, legislative power to afford creditors ample remedies against the frauds of debtors, or to punish such frauds as crimes, would not be thereby circumscribed. The debt is one thing, a due from the debtor to the creditor; the fraud of the debtor, whether it is perpetrated in contracting the debt, or, subsequently, in shift or device to elude payment, is another, and essentially a different thing. Imprisonment for the fraud would not, in any just sense, be imprisonment for debt, but for a violation of good faith, of moral and legal duty. Whether the fraud shall furnish the creditor a remedy against the person of the debtor, or shall be punished as a crime, rests in legislative wisdom. There is much of conflict of opinion, which is the wiser legislative policy; but none, so far as I know, as to legislative power. We have statutes punishing as criminal offences some frauds on creditors; but it is unfortunately too true, that they are more often resorted to for subserving private interests, than vindicating public justice.

The evil, the mischief of imprisonment for debt consisted in the power the creditor had over the person and liberty of the debtor; a power capable of wanton, reckless abuse. In the very nature of things, a debtor ought to be subjected only to a loss of property for the payment of debts. Property only, not the liberty of the debtor, is the source to which the creditor looks for payment; and it contributes to the satisfaction of the creditor, while restraint of the person of the debtor is, in that respect, barren and unproductive. It is this evil, this mischief, the constitution is intended to correct and remove, and to prohibit its restoration by legislative enactment. A fair and reasonable construction the constitution demands, and should receive, that its beneficial purposes may be accomplished. But it does not seem to me, that, by any just construction, it can be regarded as converting that into imprisonment for debt which was known in the law at and prior to its adoption, and had never been so esteemed or regarded. On the contrary, it refers to a thing well known, and on that alone it operates. In all constitutions, State and Federal, the right of trial by jury is secured, by guaranties expressed in language broad and general. All such guaranties have been uniformly construed as merely

[Ex parte John Hardy.]

preservative of the right of trial by jury as it existed at common law; they have not been construed as extending the right; nor have they ever been taken and read in a vague, loose sense, excluding or affecting the jurisdiction of courts known to the common law, of which the jury was not a constituent, and in which there was not a trial by jury; nor yet have they been read as prohibitory of legislative power to authorize new tribunals, without common-law powers, to proceed without a jury. The same rule and principle of construction must be applied to the clause of the constitution under consideration. All State constitutions, or statutes must be read, understood and construed in the light, and by the assistance of the common law; and the fact must be kept in view, that the rules and principles of the common law, so far as not repugnant to, or inconsistent with the constitution or statute, remain of full force.—Cooley's Const. Lim. 61; 1 Kent, 464. Imprisonment for disobedience to the orders, rules, or decrees of the Court of Chancery, was coeval with the organization of the court in this State; and the process by which it was effected has been recognized and preserved by legislation. It has nothing in common with imprisonment for debt, and its continuance depends solely on the act and conduct of the party imprisoned. It may be terminated by simple obedience, or by satisfying the court that obedience does not rest within the ability of the party.

I am not aware that constitutional provisions, or statutes, abolishing imprisonment for debt, have ever been construed as extending to, or abridging the remedies of a court of equity. The process of the court partaking more largely of the nature and character, and more nearly approximating the process by which imprisonment for debt was imposed, is the writ of *ne exeat*. The very purpose of the writ is to obtain equitable bail; and though it may issue to hold a party answerable for a debt, the authorities generally hold that statutory or constitutional provisions, abolishing imprisonment for debt, are not to be extended to it.—*Brown v. Haff*, 5 Paige, 235; *Rice v. Hale*, 5 Cush. 238. The constitution of Wisconsin declares, that "no person shall be imprisoned for debt arising out of, or founded on a contract, express or implied." In *Dean v. Smith* (23 Wisc. 483), it is said: "A writ of *ne exeat* is not imprisonment for debt, within the intent and spirit of this provision of the constitution. It is said by the authorities to be in the nature of equitable bail, and issued only by the special order of the court, when the party against whom it is asked is about to leave the jurisdiction of the court, so that the decree of the court will be ineffectual. And this, as it appears to us, is the true nature and

character of the writ of *ne exeat*. It prevents a person from going out of the State until he shall give security for his appearance, and is not imprisonment for debt, within the proper meaning and sense of these words."

Attachments for disobedience to an order or a decree of a court, requiring the performance of an act for the benefit of a party, have repeatedly been assailed, as violations of constitutional and statutory provisions abolishing imprisonment for debt ; and they have been as frequently sustained, and declared not to fall within the influence of such provisions. The case of *Ex parte Grace* (12 Iowa, 208), referred to by the court, I do not understand as affecting any question now presented. The court does not in its opinion in that case treat the imprisonment under the process issuing against the relator as imprisonment for debt, but pronounces the statute, under which the proceedings were had, offensive to a peculiar provision of the constitution of the State, in reference to trial by jury, said to have been introduced into the constitution to secure fugitive slaves the right to such trial. The decision itself, in the words of Mr. Pomeroy, the recent annotator of Sedgwick on Stat. & Const. Law (490), *is probably exceptional.*

The particular question now under consideration has been decided in Minnesota. The constitution of the State declares, that "no person shall be imprisoned for debt in this State ; but this shall not prevent the legislature from providing for imprisonment, or holding to bail persons guilty of fraud in contracting such debt." The statutes authorize proceedings supplementary to execution, by which, it seems, the defendant may be required to deliver his property to a receiver, to be applied to the payment of the judgment ; and if he disobeys the order, further declares that he may be imprisoned for contempt. In *State v. Bechts* (23 Minn. 411), it was insisted the statute was violative of the constitution. The court said : "The imprisonment is for contempt in refusing to obey an order of the court. It is true, the order relates to the debt evidenced by the judgment against the relator, but this in no way alters the fact, that the imprisonment is for the contempt, not for the debt. And the contempt does not consist in the relator's neglect or refusal to pay the debt, but in his disobedience of the order directing him to hand over certain property to the receiver. The fact that the property in question is to be handed over for the purpose of being applied to the payment of the judgment, is in no way important. The commitment is, nevertheless, in no proper sense imprisonment for debt."

In *Remley v. De Wall* (41 Ga. 446), a bill had been filed

[Ex parte John Hardy.]

for a dissolution of a partnership and a settlement of the partnership accounts. It was ascertained that Remley had a sum of money in his hands, which he was ordered to pay DeWall. Failing to obey the order, Remley was attached and imprisoned ; and it was insisted the imprisonment was in conflict with the constitutional inhibition against imprisonment for debt. The court said : "In our view of this case, Remley does not stand in the place of a debtor. The order and decree against him was for the performance of a duty, arising out of the dissolution of the partnership, under orders of the court."

If we do not intermingle things which are essentially distinct and different,—if we do not confound imprisonment for wrong with imprisonment for debt—it seems to me this matter is free from difficulty. It is impossible to pronounce, that the relator is imprisoned for default in the payment of the judgments. That default has not caused the imprisonment. If he had obeyed the decree,—if he had delivered the bonds ascertained to be in his possession, subject to the payment of the judgments—there could have been no contempt of the court, and no imprisonment. I do not say that, if a court of equity should render a simple decree for the payment of money—a decree which it may now enforce by the ordinary common-law process against property—that it would be proper to adjudge the failure to pay the decree a contempt, and resort to compulsory process against the person of the party in default to enforce payment. · That question is not now involved. But when a party is decreed to perform a duty, or to do any act, other than the mere payment of money, which the court has jurisdiction to adjudge he shall do, if he disobeys, the authority of the court is defied,—he is guilty of contempt, and the arrest and imprisonment of his person is not imprisonment for debt in any appropriate sense of the term. This is very clearly shown in the opinion of the court in *Coughlin v. Ehlert* (39 Mo. 285). "We do not mean to say," are the words of the court, "that a party may not be put in contempt for disobeying a decree for the performance of acts which are within his power, and which the court may properly order to be done. If it were shown, for instance, that the party had in his possession a certain specific sum of money, or other things, which he refused to deliver up under the order of the court, for any purpose, it may very well be, that his disobedience would be a contempt, for which he might lawfully be imprisoned." See also *Carlton v. Carlton*, 44 Ga. 216.

Some stress seems to be laid upon the omission from the Code of 1876 of all laws found in former Codes, authorizing

imprisonment for debt. It is said, this is "an emphatic leg-
islative affirmation of the fact, that the whole system of im-
prisonment 'for debt' with its machinery of duress, had been
abolished and swept away by the constitutions of 1868 and
1875." This may be conceded. There is, and can be no con-
troversy, that by these constitutions imprisonment for debt
has been abolished ; and it may well be doubted, whether
any enlightened citizen objected to the abolition, or desires
its restoration. But if the omission from the Code of the laws
referred to is a legislative affirmation of that fact, is not the
re-enactment of the statute under consideration, and of the
statute authorizing courts of equity to enforce orders, rules
and decrees, by process of attachment, a more emphatic
affirmation, that these statutes are not in any respect viola-
tive of the constitution, and form no part of the "system of
imprisonment for debt, with its machinery of duress?" The
omission is negative—the re-enactment is positive.

If the broad construction now given the constitution shall
be followed to its logical consequences, results will flow from
it, which it is scarcely possible to believe could have been
intended by any body of men who ever assembled to frame
organic laws for the State. A State insolvent law may be-
come a necessity, if the Congress shall not enact a general
bankrupt law. In such laws it is usual to introduce provis-
ions identical with the provisions found in this statute, by
which a debtor who refuses to surrender his property for the
payment of his debts, may be compelled to do so by imprison-
ment. If the doctrine of the opinion of the court is correct,
such provisions would violate the constitution. Other con-
sequences, it seems to me, must follow, which will prove det-
rimental alike to debtor and creditor.

It was the wise and humane purpose of the framers of the
constitution, to free the person and liberty of the debtor from
subjection to the mere will and caprice of the creditor ; from
his severity or recklessness ; and to prevent such subjection
from the possibility of restoration by legislative enactment.
It was not intended to lessen the liability of the property of
the debtor to the payment of debts, or to narrow the remedies
to reach and appropriate it to that end. It is not to be pre-
sumed, that constitutional or statutory provisions are in-
tended to deprive creditors of their just claims and rights, or
to deny to them appropriate remedies to reach and subject
all property, tangible or intangible, chargeable with the pay-
ment of their debts. Certainly, the words of a statute, or of
a constitution should be clear and unambiguous, before any
interpretation or construction is given them, which encour-
ages debtors to secrete their property, or convert it into a

[Burns et al. v. Howard.]

species which they can retain and enjoy in defiance of judicial power, and to the hindrance and disappointment of creditors.

Assuming the case to be of the character the court has assumed, it has been, in a regular course of judicial proceedings, to which the relator was a party, ascertained that he has fifty-one thousand dollars of United States bonds, subject to the payment of his debts. The City Court decreed, that he should deliver so many of the bonds as would pay the judgments against him, not amounting to one thousand dollars. Of the decree he had full notice, and ample opportunity to make the delivery was afforded. He refused to obey the decree; and for the refusal he was arrested and imprisoned. On *habeas corpus* he is now discharged, retaining the bonds ; and his creditors are informed, that the constitution forbids the enactment or execution of any law by which they can obtain from the large fund in the possession of their debtor the comparatively insignificant sums due them. I can not believe this is the law and justice of Alabama.